**UNITED STATES of America, Plaintiff,**

v.

**Nikolaus SCHIFFER, Defendant.**

**Civ. A. No. 91–5644.**

United States District Court,
E.D. Pennsylvania.

Aug. 25, 1993.

As Corrected Sept. 8, 1993.

Robin Kofsky Gold, Robert G. Seasonwein, Washington, DC, and Catherine L. Votaw, Asst. U.S. Attys., Philadelphia, PA, for government.

William E. Jones, Abington, PA, for defendant.

### DECISION AND ORDER

. VAN ANTWERPEN, District Judge.

## I. INTRODUCTION

This is a non-jury civil action under section 340(a) the Immigration and Nationality Act of 1952 to revoke the citizenship of defendant Nikolaus Schiffer, who was a member of the *Waffen*–SS Death's Head Battalion during World War II. 8 U.S.C. § 1451(a). We have jurisdiction under 8 U.S.C. § 1451 and 28 U.S.C. § 1345. We previously discussed this matter in some detail in our opinion dated February 25, 1992. *United States v. Schiffer*, 798 F.Supp. 1128 (E.D.Pa.1992).

Beginning on March 16, 1993, this court heard 7 days of testimony regarding the plaintiff's claims and the defendant's defenses. After carefully reviewing the extensive record in this case, including the trial transcript, the exhibits and the parties' post-trial memoranda and briefs, we set forth the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### A. Defendant's Pre–War and Citizenship Background

1. Defendant was born on April 9, 1919 in Philadelphia, Pennsylvania to non-citizen parents. (Schiffer, March 30, 1993, p. 34.) [1]

2. In late 1920, the defendant moved with his parents to Moravitza, Romania, an ethnic German community. (Schiffer, March 30, 1993, pp. 34, 36). In Romania, defendant attended school through the sixth grade. At age 13 he went to Timisora, Romania for three years to learn his trade as an apprentice pastry chef. (Schiffer March 30, 1993, p. 37) Starting at about age sixteen, Schiffer worked variously as a baker and a farmhand in Romania. (*Id.*, p. 38).

---

1. References are to trial testimony, specified by witness name and page reference, unless otherwise indicated. If a witness testified for more than one day, the date of the pertinent testimony is specified.

3. Defendant had relatives who remained in the United States, including his maternal grandparents and uncles. Defendant's parents remained in contact with these relatives while defendant and his parents resided in Romania. (Schiffer, March 31, 1993, pp. 45–46.)

4. Defendant's parents were both born in an area of Romania known as the "Banat," which prior to 1918 belonged to Austria–Hungary. As a result of the treaty ending World War II, the Banat was ceded to Romania, and all residents of the Banat were accorded Romanian citizenship by Romanian law. (Stanoiu, pp. 92–93; P–102; P–9 at nos. 4 and 5.)[2]

5. Under Romanian law, the defendant automatically acquired Romanian citizenship derivatively from his father. (Stanoiu, p. 94.)

6. As a minor, defendant possessed dual United States and Romanian nationality. (Stanoiu, p. 94; P–102; P–9 at nos. 4 and 5.). As a Romanian national, defendant was subject to be called for military service, (Stanoiu, p. 96), but as a United States citizen, he could not be compelled to serve. (Stanoiu, pp. 95, 96).

7. Neither the United States nor Romania recognized the concept of "dual nationality" or dual citizenship for adults at the time defendant attained his majority. (Stanoiu, p. 94; P–102.). As a minor, however, defendant was able to maintain dual citizenship; upon reaching majority at twenty-one years of age, he had to choose citizenship in one or the other country. (Stanoiu, pp. 91, 94–95.)

8. At all times prior to his service in the Romanian Army, defendant knew he was an American citizen. (Schiffer, March 31, 1993, pp. 39–40; Defendant's Memorandum In Support of Motion to Dismiss, pp. 2–4;[3] Defendant's Response to Government's First Set of Interrogatories, P–157 at No. 12; Defendant's Response to Government's Second Set of Interrogatories, P–158 at No. 2; Defendant's Response to Government's Request for Admissions, P–158 at Nos. 3, 6, 7, 12, 17; Defendant's Deposition, P–14, Vol. I, at pp. 11, 30, 32, 36, 55.)

9. Between 1921 and December 12, 1941, the United States continuously maintained diplomatic relations with Romania, and staffed a Legation in Bucharest. The Legation was closed after Romania declared war on the United States. (Callow, pp. 136, 137–139.)

10. At the time of his induction and entry into the Romanian Army, defendant was aware of an American diplomatic presence in Romania. (Schiffer, March 31, 1993, pp. 54–55; P–14, Vol. I., pp. 44–45.)

11. The Legation in Bucharest provided a full range of consular services, including the issuance of passports to United States citizens and providing assistance to citizens living or travelling abroad. (Callow, pp. 137–39, 140–41.)

12. Despite the presence of an American Legation in Romania and defendant's knowledge that he was an American citizen, defendant never sought the assistance of the Legation or inquired as to his rights as an American citizen. (Schiffer, March 31, 1993, pp. 54–55; P–14, Vol. I, pp. 44–45.)

## B. *Defendant's Romanian Army Service*

13. On March 25, 1940, defendant presented himself for registration for the Romanian Army. Defendant's Personnel Record and Personnel Military Record indicate that upon entering the Romanian Army, defendant's only objection to service was as the only son of a widow. (P–17, P–18.) These records do not indicate any objection on the grounds of, or claim by defendant of, American citizenship when he registered for or entered Romanian Army service. (P–17, P–18.)

---

2. References to "no." following P–9 refer to the documents that comprise each of the seven numbered paragraphs listed in the State Department letter dated March 3, 1993 which identifies the contents of defendant's passport file, P–9. The section numbers appear on the top right corner of the first document in that section.

3. Additionally, the parties stipulated on the record at defendant's deposition that neither he nor his counsel would take a position contrary to the facts that were alleged in the Motion to Dismiss. (P–14, Vol. 3, p. 142, lines 7–19).

14. All Romanians were obligated to serve in the Romanian Army. (Stanoiu, p. 96; P–23.) Subjects of foreign countries were prohibited from serving. (Stanoiu, p. 96; P–23.) United States citizens were exempt from service in the Romanian Army. (Stanoiu, p. 96; P–23.) There is no documentary evidence that defendant asserted to anyone in the Romanian military or American Legation that he was a United States citizen and, therefore, exempt from service. Had defendant asserted his United States citizenship, he would not have been permitted to serve in the Romanian Army, (Stanoiu, p. 96; P–23.), and his induction into service would have been deferred for one year so that he could obtain documentation of his claim, such as a birth certificate. (Stanoiu, pp. 107–108; P–23.)

15. In 1941, defendant was notified to report for basic training for Romanian Army service. At that time, defendant did not protest service on the grounds that he was an American citizen. Like his fellow soldiers, defendant swore an oath of allegiance to the Romanian monarch, King Carol II.[4] (Schiffer, March 30, 1993, pp. 38–39; March 31, 1993, p. 58; P–9 at nos. 3, 4, 5 and 7; P–14, Vol. I, pp. 37–38; P–17.)

16. On May 24, 1941, upon completion of basic training in the Romanian Army, defendant was released in accordance with Romanian law, since he was the sole son of a widow. (Schiffer, March 30, 1993, p. 39; P–14, Vol. I, p. 37; P–17.)

17. Upon release from basic training, defendant made no effort to contact the American Legation in Bucharest to seek help in avoiding military service or returning to the United States, or to determine his rights as an American citizen. Defendant made no effort to contact his relatives in the United States to inquire about returning to the United States. (Schiffer, March 31, 1993, pp. 59–60; P–14, Vol. I, pp. 45–47.)

18. Romania entered World War II on June 22, 1941 as an ally of Nazi Germany. Romania remained an independent sovereign state and an ally of Germany throughout World War II. (Sydnor, March 16, 1993, p. 66, 74.)

19. Romania declared war on the United States on December 12, 1941, following Hitler's declaration of war on the United States. The next day, the United States declared war on Romania. (Sydnor, March 16, 1993, pp. 88–89.)

20. Defendant was recalled into the Romanian Army after Romania had declared war on the United States and served therein until July 17, 1943. At the time he was recalled, although he knew that he was an American citizen and that Romania had declared war on the United States, defendant did not protest serving in the Romanian Army. (P–14, Vol. I, p. 63.)

21. Defendant's induction into the service in the Romanian Army was willful and voluntary. (P–9, at nos. 4 and 5; P–13; P–17; P–18.)

22. By voluntarily joining and serving in the Romanian Army, defendant chose to retain his Romanian citizenship and to relinquish his United States citizenship. (Stanoiu, pp. 96–97.)

23. The Nationality Act of 1940, 54 stat. 1171, specified certain acts which constituted expatriating acts, including taking an oath of allegiance to a foreign sovereign. (Callow, pp. 140–41.)

24. By willingly serving in the Romanian Army, defendant committed an expatriating act. Defendant's service in the Romanian Army at a time when Romania was an ally of Nazi Germany and at war with the United States constitutes objective evidence of his intent to relinquish his United States birth citizenship. (Callow, pp. 136, 151, 154, 164, 165, 170; P–21.)

25. Defendant's service in the Romanian army at a time when Romania was at war with the United States also constituted an expatriating act pursuant to the Immigration and Nationality Act of 1952. (Callow, p. 143, 151.)

26. Contemporary standards of review under *Vance v. Terrazas*, 444 U.S. 252,

---

**4.** The text of this oath has not been produced.

100 S.Ct. 540, 62 L.Ed.2d 461 (1980), establish an administrative presumption of intent to retain United States citizenship unless there is objective evidence of conduct inconsistent with retention of citizenship. Romanian military service and oath of allegiance to King Carol II constitute expatriating acts inconsistent with the retention of citizenship. (Callow, pp. 151, 164.)

## C. *Historical Background*

27. On February 29, 1933, following the rise to power of Adolf Hitler and the Nazi Party in Germany, a state of emergency was declared in Germany and all constitutional guarantees of individual liberty and civil rights were suspended. Pursuant to decree, the SS (*Schutzstaffel* or protection squads) was authorized to arrest, without warrant and without judicial recourse, persons who were suspected of being enemies of Hitler and the Nazi Party and hold them in "protective custody." This decree was in effect until May 7, 1945. (Sydnor, March 16, 1993, pp. 53–55, 57–58, 89, 90, 102; P–71.)

28. The SS implemented the aims and objectives of Nazi Germany. All police power was centralized into the hands of the SS. The SS was responsible for the administration of the concentration camps. (Sydnor, March 16, 1993, pp. 61, 63–64, 100, 111.)

29. Enemies of Hitler and the Nazi Party included political opponents, such as members of dissenting political parties or moderate parties who criticized the regime; "asocials," which included the unemployed, mentally disturbed, and physically handicapped; homosexuals; homeless people; religious dissenters such as Jehovah's witnesses and the Catholic clergy; Communists; Marxists; Gypsies; Jews; and Poles. (Sydnor, March 16, 1993, pp. 92, 95, 97, 116–117; P–70; P–95.)

30. Between 1933 and 1945 the policy of protective custody was broadened and enabled the SS and police to arrest anyone for any reason and put that person in a concentration camp indefinitely. (Sydnor, March 16, 1993, pp. 92, 93.) Prisoners in concentration camps were physically abused by SS guards. They were subjected to corporal punishment, including beatings and executions. The regiment to which they were subjected was consistently harsh, brutal and often fatal. Treatment of prisoners grew worse as the war went on. (Sydnor, March 16, 1993, pp. 92–93, 102–103, 144–145; Chakin, pp. 17, 22–24, 28–29; Fenster, pp. 53–54, 67, 70; Messer, pp. 107, 115–116, 123–124; P–38; P–46; P–72.)

31. By 1938, anyone arrested on a protective custody warrant was put in a concentration camp. (Sydnor, March 16, 1993, p. 102.) By 1939, persons arrested pursuant to protective custody could be subjected to execution, euphemistically referred to as "special treatment," by order of the police. Persons slated for special treatment were shot, at the concentration camp to which they were sent. (Sydnor, March 16, 1993, pp. 115, 177–179; P–72; P–41; P–52; P–73; P–101.)

32. In September 1939, Nazi Germany invaded Poland, starting World War II. (Sydnor, March 16, 1993, p. 88.) Hitler's objective was total victory, which encompassed the complete destruction of his enemies, *i.e.,* defeat of the army, the massacre of political leadership, deportation of the population, liquidation of the educational and intellectual human infrastructure of the society. (Sydnor, March 16, 1993, p. 107.)

33. The outbreak of World War II dramatically increased the power of the SS, whose police and security responsibilities were extended into the areas that Germany annexed, occupied or influenced after the start of World War II. (Sydnor, March 16, 1993, p. 104.)

34. The *Waffen*–SS ("Armed SS"), formed in 1939, was an elite guard within the SS. The *Waffen*–SS included military units that fought on the front, and all of the guard units in concentration camps. Guard units in the concentration camps were referred to as *Waffen*–SS Death's Head Battalions or SS *Totenkopfsturmbann.* (Sydnor, March 16, 1993, pp. 136, 151; P–137.)

35. The *Wehrmacht* constituted the armed forces of Germany, consisting of the Army, the Navy, and the Air Force. The *Waffen*–SS was a Nazi party organization originated and organized as a paramilitary force of the Nazi Party; it considered itself

an elite Nazi organization. The *Waffen*–SS was not part of the *Wehrmacht* or the German Army. (Sydnor, March 16, 1993, pp. 67–69; Ziemke, pp. 13–15, 61, 72–73; *United States v. Schellong*, 717 F.2d 329, 331, (7th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).) One could not be a member of both the *Waffen*–SS and the German Army. The German Army played no role in the running of concentration camps. (Sydnor, March 16, 1993, p. 104.) Recruitment, training, discipline, pay and uniforms differed between the *Waffen*–SS and the *Wehrmacht*. (Sydnor, March 16, 1993, p. 68; Ziemke, p. 13.)

36. After the outbreak of World War II, concentration camps rapidly grew in number and size. The camps came to have an enormous significance for the German war effort because of the utilization of concentration camp prisoners as slave laborers. Prisoners were intentionally worked to death. (Sydnor, March 16, 1993, p. 105; P–67.) It was intended that prisoners would be exterminated through hard labor. (Sydnor, March 16, 1993, pp. 105, 106, 126, 172; P–88.)

37. The population of concentration camps included American citizens who were in Europe when World War II broke out. Some of these people perished while imprisoned at the camps. During the War, some Allied POWs were held at concentration camps and murdered. (Sydnor, March 16, 1993, pp. 106–107; March 17, 1993, p. 16; P–36; P–63.)

38. Estimates for the total number of persons killed in Nazi concentration camps range between seven and nine million persons. (Sydnor, March 19, 1993, pp. 69–70.)

39. Nazi ideology considered the Jews responsible for all of the problems of the twentieth century and advocated the extermination of all Jews. By 1941 a plan was initiated for the extermination of European Jews. The SS referred to the extermination of European Jews as "the Final Solution to the Jewish Question" (Sydnor, March 16, 1993, pp. 107–109, 111; P–90.) Concentration camps were created in Poland to serve as extermination centers for the Jews of Europe. (Sydnor, March 16, 1993, p. 110; March 18, 1993, p. 134.)

40. Prior to World War II there were 11 million Jews in Europe; from five to eight million Jews died in concentration camps. (Sydnor, March 19, 1993, pp. 66–70.)

**D. Concentration Camp Guards—General Background**

41. The guards in the concentration camps played an essential role in the Final Solution. SS guards were responsible for clearing Jews from ghettos where they were already concentrated, transporting them to the various extermination camps, and guarding and securing the process of extermination at the camp, location or facility itself. Guards administered the looting and confiscating of effects of the people who were murdered in the camps. (Sydnor, March 16, 1993, p. 111–112.)

42. Guards at concentration camps were responsible for the security of the camp, keeping the prisoners in the camp, guarding the prisoners during work details, and enforcing the rules and regulations that governed the concentration camps. (Sydnor, March 16, 1993, pp. 137–139, 147.)

43. Guards were always armed when they performed guard duty. Guards were trained to fire their weapons if a prisoner attempted escape, if attacked by a prisoner, or if the prisoners mutinied. (Sydnor, March 16, 1993, pp. 142–143; Chakin, p. 20; Fenster, pp. 53–54; Messer, p. 115; P–154, pp. 19, 43, 48.)

44. Guards received training prior to and during their service as guards. Training included physical conditioning, weapons training, combat assault tactics, riot control, rules and regulations relating to guard duty and ideological and political indoctrination sessions. Training was typically continuous throughout the individual's service as a guard. (Sydnor, March 16, 1993, pp. 137, 139–140, 153–158; March 17, 1993, p. 66; P–44; P–83.)

45. Concentration camp guards received continuous ideological training including the history of the SS, the purpose of concentration camps, the reasons that people were imprisoned in camps, and the claim that the

camps housed the most dangerous enemies of the state. (Sydnor, March 16, 1993, pp. 103–104, 140, 141, 145, 156; P–97; P–82.)

46. Guards were paid and received days off during which they were allowed to leave the camp. (Sydnor, March 16, 1993, p. 148; Schiffer, March 31, 1993, p. 73.)

47. If someone refused duty as a concentration camp guard, he was transferred. There is no evidence that guards were killed for refusing to perform guard duties. (Sydnor, March 16, 1993, p. 146.)

48. Concentration camp guards participated in the Nazi program of persecution carried out in the concentration camps by preventing the escape of prisoners and by escorting prisoners to and from slave labor sites. (Sydnor, March 19, 1993, pp. 72–73.)

### E. Concentration Camp Prisoners—General Background

49. Upon entry into a concentration camp, a prisoner was "processed": he was branded with a tattoo, issued a uniform, had his head and genital area shaved; and all of his personal effects were confiscated. (Sydnor, March 16, 1993, pp. 161, 180; P–27; Messer, pp. 120–121.)

50. A prisoner uniform consisted of striped trousers and a coat, similar in weight to pajamas, and a pair of wooden clogs. (Sydnor, March 16, 1993, pp. 161, 164; Chakin, p. 21; Fenster, p. 52; Messer, P. 112.) A prisoner received no additional clothing in winter. (Sydnor, March 16, 1993, p. 164; P–154, p. 33.)

51. Prisoners wore a triangular colored badge on the left breast and the right leg of their uniform which designated why they were imprisoned; these patches were designed to be seen at a distance by the guards. Professional criminals wore green triangles, Jehovah's Witnesses purple, homosexuals pink, political prisoners red, asocials black; Jews wore two yellow triangles inverted on each other so that they formed the Star of David. Jewish inmates who were judged to be politically dangerous had the Star of David bordered in red. Prisoners considered high risk for escape had a target painted on the back of their jacket. Guards were trained to recognize what each of the color codings meant. (Sydnor, March 16, 1993, pp. 162–163; March 19, 1993, pp. 7–8, 14, 89–90; Chakin, p. 25; Messer, p. 112–113; P–154, pp. 34–36, pp. 79–80; P–103a.)

52. Prisoners were treated differently depending on their ethnic background. In all concentration camps, Jews received the most severe mistreatment. Soviets, Poles and Gypsies were also subjected to severe mistreatment. (Sydnor, March 19, 1993, pp. 76–87; P–56; P–32; P–37; P–26.) Guards were not punished for committing acts of brutality against prisoners. (Sydnor, March 16, 1993, pp. 170–171.)

53. Camp conditions subjected the prisoners to extreme physical abuse. There were no sanitary facilities, running water or heat. The food was so inadequate that people starved to death. Jews were given even less to eat than other prisoners. (Sydnor, March 16, 1993, p. 165; Chakin, pp. 24, 29; Fenster, pp. 59, 66; Messer, p. 117; P–154, pp. 34–36, 124–125.) Prisoners developed dysentery and typhus as a result of the conditions in the camps and received no medical attention. These conditions existed in the camps between 1943 and 1945, when defendant was a concentration camp guard. (Sydnor, March 16, 1993, p. 170; Sydnor, March 19, 1993, p. 72; Fenster, pp. 59, 64–66, 73; P–154, pp. 53, 90, 145.)

54. A prisoner worked a minimum 11-hour day, six days a week. If prisoners were employed at a work site outside of the camp, the SS guards would escort the prisoners to the work site in time for them to begin work by dawn. (Sydnor, March 16, 1993, pp. 166, 183; Fenster, p. 63; P–77.)

55. Prisoners were counted twice each day: in the morning, prior to leaving for work, and in the evening when they returned. Prior to beginning work, all prisoners were required to be present in the roll call square for counting. The tally from the evening roll call had to match that of the morning roll call. If anyone had died during the night, that person's body was dragged to roll call to be counted. Similarly, the evening roll call number had to match that morning's roll call number. The bodies of

those shot or those who had died during the day from other causes, including beatings or exhaustion, had to be returned to the camp by the prisoners. At the conclusion of the evening roll call, the gates of the protective custody portion of the camp were locked. (Sydnor, March 16, 1993, pp. 166–168.) If the count did not tally, prisoners were forced to stand, sometimes for several hours, until the missing prisoners were accounted for. (Fenster, pp. 60; 64; Messer, pp. 114–116, 118; P–154, pp. 36–39.)

56. Prisoners in concentration camps were subjected to a code of conduct consisting of disciplinary and penal regulations. (Sydnor, March 16, 1993, p. 171.) The Dachau Regulations, P–40, served as the basis upon which all subsequent rules and regulations were modeled. (See also P–42.) Subsequent disciplinary and penal regulations became increasingly more stringent over time. Prisoners in concentration camps were subjected to both official and unofficial punishments. (Sydnor, March 16, 1993, pp. 168, 175–176; P–24.)

57. Official punishments were administered by the SS personnel at the camp. These punishments included beatings with whips and sticks or placing a prisoner in solitary confinement. Examples of infractions for which a prisoner could be punished included escape attempts, talking back to an SS guard, attempting to commit an act of violence against an SS guard, shirking or slacking off at work, trying to smuggle something into or out of the camp, carrying a comb (construed as carrying a deadly weapon), or wearing extra clothing (construed as sabotage). It was the practice to have corporal punishment inflicted on prisoners with all of the prisoners and guards of the camp present. (Sydnor, March 16, 1993, pp. 168–169, 172–173; March 18, 1993, p. 165; Messer, p. 123–124.)

58. Prisoners who attempted escape were either executed or tortured. If executed, the prisoner would be hanged in the presence of all other prisoners, who were forced to watch the hanging. (Sydnor, March 16, 1993, p. 170; Messer, p. 124.)

59. Bodies of deceased prisoners · were disposed of through burning, either in a camp crematorium or in large pits. Prior to burning a body, the corpse was examined by a special team of prisoners who were assigned the task of removing any gold fillings from the teeth of deceased prisoners. That gold was then collected, melted down, and deposited in an SS bank account. (Sydnor, March 16, 1993, pp. 173, 182; Chakin, pp. 16–17, p. 38.)

## F. Defendant's Voluntary Enlistment and Service In the Waffen–SS

60. On May 12, 1943, a diplomatic agreement was reached between Germany and Romania which permitted *Wehrmacht* and *Waffen*–SS recruiters to set up recruiting stations in Romanian towns and villages where *Volksdeutsche* (ethnic Germans) lived, to enlist Romanian citizens or nationals of ethnic German origin for voluntary service. Pursuant to the terms of the agreement, Romanian citizens or nationals of ethnic German origin "wishing to enlist" in the *Wehrmacht* or *Waffen*–SS had to execute a written declaration stating that their enlistment was voluntary. Ethnic Germans of Romanian citizenship or nationality serving in the Romanian Army had three voluntary military options according to the agreement: they could join the *Wehrmacht*, serve in the *Waffen*–SS, or remain in the Romanian Army. Romania guaranteed that no sanctions would be imposed on those ethnic Germans who did not enlist in the *Wehrmacht* or *Waffen*–SS. (Sydnor, March 16, 1993, pp. 73–74; P–81; P–68.) The recruitment of ethnic Germans in Romania by the *Waffen*–SS and *Wehrmacht* produced a substantial number of volunteers. (Sydnor March 16, 1993, p. 78; P–67; P–68)

61. On June 4, 1943, defendant, an ethnic German from Romania, volunteered to serve in the *Waffen*–SS in accordance with the terms of the aforementioned agreement between Romania and Germany and was, consequently, discharged from the Romanian Army. (Sydnor, March 16, 1993, p. 87; P–11 at 3; P–15; P–17; P–18.)[5]

---

5. P–11 consists of unnumbered pages. Page cites to this document refer to consecutively

62. Defendant was a member of the *Waffen*–SS *Totenkopfsturmbann* (Death's Head Battalion) and served as a concentration camp guard from July 28, 1943 through May 4, 1945. (P–11 at 3, 4.)

63. Like his fellow SS members, defendant swore an oath of allegiance to Adolf Hitler when he joined the *Waffen*–SS. (Sydnor, March 19, 1993, pp. 5, 88.) [6]

64. Defendant, while serving as a concentration camp guard, never requested a transfer and never refused any assignment. (Schiffer, March 31, 1993, p. 69.)

## G. *Defendant's Service As a Concentration Camp Guard*

### 1. *Sachsenhausen*

65. Sachsenhausen Concentration Camp, located in Oranienburg about fifteen miles north of Berlin, operated from 1935 until 1945. The purpose of Sachsenhausen was to incarcerate political prisoners and other enemies of the German state. Jews were imprisoned at Sachsenhausen solely because they were Jews. (Sydnor, March 17, 1993, p. 13; Messer, p. 126.) From July through December 1943, there were between 8,000 and 15,000 persons imprisoned at Sachsenhausen from virtually every country in Europe because they were considered enemies of national socialism (Nazism). (Sydnor, March 17, 1993, p. 24; March 18, 1993, pp. 156–158; Messer, p. 120–121; P–112; P–114.)

66. Defendant, as a member of the *Waffen*–SS *Totenkopfsturmbann* (Death's Head Battalion), served as an armed concentration camp guard at the Sachsenhausen Concentration Camp from July 1943 until December 1943. While stationed at Sachsenhausen, defendant's duties included receiving training and performing guard duty. (Sydnor, March 17, 1993, pp. 5, 110; Schiffer, March 31, 1993, p. 65; P–11 at 3, 31; Complaint, ¶ 11.)

67. Sachsenhausen was enclosed by an electrified fence. From the guard barracks, one could see into the protective custody compound. P–63 accurately depicts Sachsenhausen as it existed in 1943. (Sydnor, March 17, 1993, pp. 13–15, 18, 19; P–63.)

68. Sachsenhausen included a Special Camp for POW officers and soldiers of the Western Allies. (P–63.) This special camp housed a number of Allied officers and bomber crews, including Americans, while defendant served as a guard at Sachsenhausen. (Sydnor, March 17, 1993, p. 16; P–63.) These Allied officers and soldiers were easily recognizable because they remained in their military uniforms. In the summer of 1943, a group of American and British airmen who were imprisoned at Sachsenhausen were executed. (Sydnor, March 17, 1993, pp. 16–18; March 18, 1993, p. 156; March 19, 1993, p. 14; Messer, p. 120.)

69. Sachsenhausen contained firing squad ditches, where SS guards executed prisoners, and "Station Z" where, under the guise of a medical examination, a prisoner would be placed against the wall and shot by an SS guard in the back of the head through an opening in the wall. It also contained a crematorium, where corpses of prisoners were burned, and a gas chamber. The gas chambers at Sachsenhausen were used to kill prisoners who were no longer physically able to work. (Sydnor, March 17, 1993, pp. 19–21; March 19, 1993, pp. 39, 50; Messer, pp. 123–124; P–63.)

70. From 1942 through 1944 medical experiments were conducted on prisoners at Sachsenhausen. Prisoners selected to be experimented upon had no choice but to submit to the experimentation. During the later half of 1943, while defendant was a guard at Sachsenhausen, prisoners were involved in experiments in which they were deliberately given phosphorus burns and typhus. (Sydnor, March 17, 1993, pp. 22–24; P–57; P–58; P–60; P–86; P–87; P–113.) All prisoners experimented upon died. (Sydnor, March 17, 1993, pp. 21–22; P–30.)

numbered pages in plaintiff's copy.

**6.** A typical oath read:
I swear to thee ADOLF HITLER, as *Fuehrer* and Chancellor of the German *Reich*, Loyalty and Bravery. I vow to thee and to the superiors who thou shalt appoint, obedience unto death, so help me God. (P–14, Vol. I, Ex. 6).

71. The normal life expectancy of a prisoner at Sachsenhausen from July to December 1943 was three to five months. (Sydnor, March 17, 1993, p. 25.) The primary causes of death were shooting, starvation, exhaustion and disease. (Sydnor, March 19, 1993, pp. 42–43.)

72. Defendant received a uniform, blood group tattoo, rifle and ammunition upon arrival at Sachsenhausen. Defendant's uniform had a *Totenkopf* (death's skull or "death's head") on it. Defendant retained the rifle issued to him at Sachsenhausen the entire time he was in the *Waffen*–SS. Defendant received a salary as a member of the *Waffen*–SS *Totenkopfsturmbann*. (Schiffer, March 31, 1993, pp. 65–67.)

73. Guard duty at Sachsenhausen included watchtower duty, walking the perimeter of the camp and accompanying prisoners to slave labor details outside of the camps. The main reason for the guards was to prevent prisoners from escaping. (Sydnor, March 17, 1993, pp. 25–26.)

74. By serving as a guard at Sachsenhausen from July through November 1943, defendant performed all of the duties required of guards and, thereby, participated and assisted in persecution. (Sydnor, March 17, 1993, p. 26.)

75. Following service as a guard at Sachsenhausen, defendant was transferred to the SS Training Facility Camp Complex at Trawniki. (Sydnor, March 17, 1993, pp. 5, 110; P–11 at 3, 24, 31.)

### 2. *Trawniki*

76. The SS Training Facility Camp Complex at Trawniki, located in the southeastern section of the Lublin district of Poland, operated from October 1941 until the spring of 1944. (Sydnor, March 17, 1993, p. 36.)

77. Defendant, as a member of the *Waffen*–SS *Totenkopfsturmbann*, served as an armed guard at the SS Training Facility Camp Complex at Trawniki from December 1943 through February 1944. While stationed at Trawniki, defendant's duties included receiving training and performing guard duty. (Sydnor, March 17, 1993, pp. 6, 43, 110; P–11 at 3, 24, 31.)

78. The SS Training Facility Camp Complex at Trawniki consisted of an SS training compound and an adjoining forced labor camp. The labor camp was enclosed with concentric fencing that was electrified. (Sydnor, March 17, 1993, pp. 37–38; P–94.)

79. In October 1943 there were over 6,000 prisoners at Trawniki, mostly Jews who had been moved to Trawniki from the Warsaw ghetto. Jews were imprisoned at Trawniki solely because they were Jews. (Chakin, pp. 31–32.) They lived in wooden barracks and were forced to perform slave labor at the camp enterprises. (Sydnor, March 17, 1993, p. 38.)

80. On November 3, 1943, virtually all of the above-mentioned 6,000 prisoners were murdered in "Operation Harvest Festival" as part of "Operation Reinhard," the code name given to the Nazi program for exterminating all of the Jews of Poland. Large ditches were dug in the eastern perimeter of the camp, and on the morning of November 3, 1943, the camp was surrounded by several battalions of *Waffen*–SS and police. The Jewish prisoners were rounded up, marched into the eastern perimeter of the camp, selected out in batches of 100 to 150; they were forced to undress, to climb down into the ditches and to lie down; then they were machine-gunned to death. Operation Harvest Festival lasted for sixteen hours until the last of the prisoners was shot. (Sydnor, March 17, 1993, pp. 38–42; Chakin, p. 14.)

81. The bodies of the victims were originally buried in the ditches. Subsequently, an order was issued to exhume the bodies and burn them to destroy all evidence of these murders. For approximately six weeks, at a time when defendant was a guard at the camp, a group of Jewish male prisoners was employed in Trawniki to burn the bodies of those who had been killed. These men were themselves shot by the SS guards and police detachments after the burning of the bodies was completed. The only prisoners that remained were a group of women who were left to sort the belongings of the prisoners, clean up the camp and do the laundry of the SS. (Sydnor, March 17, 1993, pp. 42–43; Chakin, pp. 16–17, 23–24, 38.)

82. By serving as a concentration camp guard at Trawniki from December 1943 to February 1944, defendant participated and assisted in persecution. (Sydnor, March 17, 1993, pp. 48–49.)

### 3. *Majdanek*

83. Defendant as a member of the *Waffen*–SS *Totenkopfsturmbann*, served as an armed guard from February 1944 through July 1944 at the Lublin Concentration Camp, also known as the Majdanek Concentration Camp. (Sydnor, March 17, 1993, pp. 6, 51, 110; Schiffer, March 30, 1993, p. 59; March 31, 1993, p. 68; P–11 at 1, 3, 24, 30, 31.)

84. Majdanek, located on the southeast side of the city of Lublin in Poland, served as one of the principal killing centers for the conduct of Operation Reinhard. As such, it was instrumental in the "Final Solution" to the Jewish question. Between 200,000 and 1.1 million people died at Majdanek during the course of World War II. (Sydnor, March 17, 1993, pp. 50, 51, 127.)

85. Majdanek was enclosed by barbed wire. The protective custody compound consisted of six compounds, where the prisoners were housed and worked. Each of the six compounds was enclosed by an electrified fence, and the entire protective custody compound was also enclosed by an electrified fence and surrounded by watchtowers. Each of the six compounds also had gallows for executing prisoners who violated rules. There were gas chambers and a crematorium at Majdanek. (Sydnor, March 17, 1993, pp. 52–54; March 19, 1993, pp. 41–42; Chakin, p. 26; P–14 at Ex. 12; P–78.)

86. Between February and July 1944, approximately 10,000 to 15,000 prisoners were confined at Majdanek. Prisoners included Jews, political prisoners, prisoners of war, suspected partisans, and children. Jews were imprisoned at Majdanek solely because they were Jews. The prisoners were used as slave labor. (Sydnor, March 17, 1993, pp. 54–56; P–89; Chakin, pp. 31–32.)

87. From February to July 1944, conditions in the camp worsened as the fighting front approached the camp. The camp became severely overcrowded; sanitary condi-

tions worsened, food became more scarce. Normal life expectancy for a prisoner at Majdanek from February through July 1944 was three months. (Sydnor, March 17, 1993, pp. 56–57; P–115a; P–115b.)

88. Guard duty at Majdanek from February through July 1944 consisted of guarding prisoners within the protective custody compound, guarding prisoner work details, and dealing with security tasks outside of the camp involving partisan actions. (Sydnor, March 17, 1993, p. 57; P–61.)

89. While stationed at Majdanek, defendant guarded prisoners from the watchtowers. (Schiffer, March 30, 1993, p. 60.) Defendant was armed with a rifle while on watchtower duty. (Schiffer, March 31, 1993, p. 68.) The primary purpose of watchtower duty, as with all types of guard duty, was to prevent the escape of prisoners. (Schiffer, March 30, 1993, p. 60.) The standing order for a watchtower guard was to shoot any prisoner who left his barracks during the night. Guard regulations also ordered that prisoners be shot if they approached the camp fences. (P–61.)

90. With the advance of Soviet forces, evacuation of prisoners from Majdanek to Auschwitz began in April 1944 and continued through July 1944. (Sydnor, March 17, 1993, pp. 55, 58–59; Chakin, pp. 27–30.)

91. During the evacuation of the Majdanek Concentration Camp, defendant left Majdanek in July 1944 and guarded prisoners as they were moved from Majdanek to Auschwitz. (Sydnor, March 17, 1993, pp. 7, 10, 111; P–11 at 3, 25.) Guards mistreated prisoners during the evacuation. (Chakin, pp. 28–29.) Many prisoners were transported in railroad boxcars with closed doors. As a result many died during the evacuation. (Ziemke, p. 34.) Other prisoners were forcibly marched on foot to Auschwitz. Those who could not march were shot along the way. (Chakin, p. 28.)

92. Upon arrival at Auschwitz, prisoners were subjected to a "selection" to determine who was able to perform slave labor and who would go directly to the gas chamber for execution. Most of the Jews from Majdanek did not survive the selections and were

gassed immediately upon arrival. Those who survived were put to work as slave laborers. Many died while performing forced labor at Auschwitz, because of the inhumane conditions to which they were subjected by the SS. (Sydnor, March 17, 1993, pp. 59–60; March 18, 1993, pp. 135–136.)

93. By serving as a guard at Majdanek and during its evacuation to Auschwitz, defendant participated and assisted in the persecution. (Sydnor, March 17, 1993, pp. 60–61.)

### 4. *Hersbruck*

94. Hersbruck, located in Northeastern Bavaria in Germany, was the site of the Hersbruck subcamp of the Flossenburg Concentration Camp (hereinafter "Hersbruck".) (Sydnor, March 17, 1993, p. 72.)

95. Defendant, as a member of the *Waffen* –SS *Totenkopfsturmbann,* served as an armed concentration camp guard at Hersbruck from August 1944 through April 1945. (Sydnor, March 17, 1993, pp. 7, 111; Schiffer, March 30, 1993, p. 64; March 31, 1993, p. 72; P–11 at 1, 3, 24, 25, 31; P–47.)

96. Hersbruck operated from May 1944 until April 1945 to provide slave labor for the construction of a series of tunnels planned to house underground bomb-proof factories and installation centers in the Hubirge Mountains, above the village of Happburg, near Hersbruck. These facilities were to be constructed underground so that war production facilities would not be interrupted by damage from Allied bombing. (Sydnor, March 17, 1993, pp. 73–76; P–111.)

97. From August 1944 through April 1945, approximately 10,000 prisoners from almost every European country were confined in Hersbruck. After September 1944 there was a large number of Hungarian Jews at Hersbruck. Jews were imprisoned at Hersbruck solely because they were Jews. (Sydnor, March 17, 1993, p. 77; Fenster, p. 74; P–154, pp. 51, 79.)

98. The Hersbruck camp was surrounded by an electrified fence. (Sydnor, March 17, 1993, p. 77; Fenster, p. 68; P–154, pp. 36–39.) Conditions at Hersbruck were horrible; prisoners were overworked, underfed and physically abused. (Sydnor, March 17, 1993, pp. 77–78, 89; Fenster, pp. 59, 63–66; P–34; P–111; P–128; P–134; P–154, p. 55.)

99. During the period when defendant was a guard at Hersbruck, the normal life expectancy of a prisoner was less than two months. The causes of death included exhaustion, typhus, malnutrition, exposure and murder. The Hersbruck camp was referred to as a death detail because the mortality rate was so high. (Fenster, pp. 59, 63–66; P–139, p. 2262; P–154, pp. 49–53.) Only the Mauthausen Concentration Camp listed a larger number of prisoner deaths. (Sydnor, March 17, 1993, pp. 78, 94–96; P–43; P–111.)

100. Bodies of deceased prisoners were cremated. Until the fall of 1944, when the number of corpses to be cremated became too great, prisoners were cremated by a firm in Nuremburg. In the fall of 1944 the camp constructed its own crematorium but it was insufficient to dispose of the large number of bodies. By January 1945 large numbers of bodies were being burned in two large open pits that were dug in the forest outside the camp. At least once a week, a large truck pulling a trailer, both of which were loaded with corpses, would leave the camp, along with a prisoners burial detail accompanied by SS guards, to burn the bodies. (Sydnor, March 17, 1993, pp. 78–79; P–133.)

101. Guard duty at Hersbruck consisted of guarding the camp and guarding prisoners taken from Hersbruck to work sites in Nuremburg, where prisoners were used as slave laborers to repair bomb damage in the railroad yard and to dig out unexploded bombs in and around Nuremburg (Sydnor, March 17, 1993, p. 81), and in the Hubirge Mountains, above the village of Happburg. (Sydnor, March 17, 1993, pp. 78, 82; Fenster, March 18, 1993, p. 61.)

102. Prisoners were escorted to and from the work sites by *Waffen* –SS guards. Prisoners were transported by rail, when available, or marched by the guards. The guards remained at the worksite to guard the prisoners and prevent their escape. Prisoners died while going to and from the worksite. Defendant, armed with a loaded rifle, escorted prisoners to and from the Happburg site

where they were forced to dig tunnels. (Sydnor, March 17, 193, pp. 84–85, p. 107; Schiffer, March 30, 1993, pp. 64–65; March 31, 1993, p. 73; Fenster, pp. 60–61, 64.)

103. Prisoners who worked at the Happburg site were grossly mistreated. Prisoner kapos, SS guards, and civilian employees of the construction firms hit prisoners with their hands, sticks, dog whips, and rubber hoses and kicked and shoved them with their feet until they were beaten bloody and collapsed on the ground. Prisoners who worked at the Happburg site worked eight or twelve hour shifts excavating the mountain. The work was hard, dirty and hazardous. Sickened, incapacitated prisoners suffered worsened health as a result of the work and conditions. (Sydnor, March 17, 1993, p. 83; Fenster, pp. 59, 63–67; P–111; P–122; P–126; P–127; P–131; P–132.)

104. In April 1945, with the United States Army advancing close to Hersbruck, the SS evacuated Flossenburg and its subcamps, including Hersbruck, by forced march to Dachau Concentration Camp. This evacuation was a "death march." Those prisoners who could not continue to march were shot by SS guards. Defendant guarded prisoners during the evacuation of Hersbruck. (Sydnor, March 17, 1993, pp. 10–11, 85–87, 111; Ziemke, p. 25, 154, pp. 56, 71, 78, 133–134; Fenster, p. 70; P–11; P–135; P–140, p. 8347; P–143; P–145.)

105. By serving as a guard at Hersbruck and then as a guard on its evacuation March from August 1944 through April 1945, defendant participated and assisted in persecution. (Sydnor, March 17, 1993, p. 85.)

H. *Defendant's Internment as a POW and Suspected War Criminal*

106. On or about May 10, 1945, defendant was captured and arrested at Altenmarkt near Traunstein, in Germany, and held by United States forces at Bad Aibling, as a prisoner of war. (P–11 at 12, 31, 33 and 35; P–22 at 6.) [7]

107. At Bad Aibling, members of the SS were separated from members of the *Wehrmacht.* (Schiffer, March 30, 1993, p. 72; March 31, 1993, p. 76.)

108. When arrested, defendant was in possession of his soldbuchersatz, or paybook, which listed the dates and the places at which he had served while a member of the *Waffen* –SS *Totenkopfsturmbann.* (Ziemke, pp. 32–33; Schiffer, March 31, 1993, p. 67; P–11 at 11.)

109. Defendant was taken from Bad Aibling to Dachau where he was investigated by the United States Army because of his service as a concentration camp guard. (Schiffer, March 30, 1993, p. 72; March 31, 1993, p. 77; P–152.) War crimes suspects were housed at Dachau. (Ziemke, p. 23.)

110. After World War II, the United States Army prosecuted war crimes in accordance with established principles of international law. Because of the atrocities that had occurred in the concentration camps, a new category, "crimes against humanity," was added to international law. (Ziemke, pp. 17–18.)

111. In 1946 the International Military Tribunal at Nuremburg declared crimes against humanity to be a war crime. The Nuremburg Tribunal adjudged the SS and the *Waffen* –SS to be criminal organizations. Anyone who was a member of these organizations was automatically a war crimes suspect and subject to automatic arrest. (Ziemke, pp. 19–20.) Members of the German Army, as well as other branches of the *Wehrmacht,* were not subject to automatic arrest. (Ziemke, p. 31; P–99.)

112. On February 25, 1946 the United States Army issued Security Memorandum No. 1, stating members of paramilitary organizations, including all ranks of the *Totenkopfverbaende* (Death's Head Unit), were subject to automatic arrest. (P–99.)

113. The Counter Intelligence Corps, (hereinafter "CIC") was the chief investigative unit of the Army during the United States occupation of Germany. War crimes

---

**7.** Document P–22 consists of unnumbered pages. Page citations to this document refer to consecu-

tively numbered pages in plaintiff's copy.

suspects were interrogated by German-speaking interrogators. (Ziemke, pp. 21–22, 81–82.)

114. On February 4, 1946, while he was interned as a war crimes suspect at Dachau, defendant was interviewed by United States Army personnel. In this interview, defendant admitted he served as a concentration camp guard at Oranienburg (Sachsenhausen), Trawniki, Lublin (Majdanek) and Hersbruck and that he left Hersbruck with prisoners.[8] Nevertheless, defendant stated in this interview "that he knows absolutely nothing concerning mistreatment, if such occurred, in any of the places he was stationed. Did not come into contact with prisoners at any time, except when marching from Hersbruck. Saw no mistreatment of any of the marching prisoners." Defendant's statements concerning treatment of prisoners are completely contrary to historical facts and common sense. (Sydnor, March 17, 1993, pp. 10–12, 85–88, 110–111; Ziemke, pp. 34–37.)

115. The original policy of the United States Army in 1945 was to develop and prosecute cases concerning the concentration camps located within the United States occupied zone. (Ziemke, p. 22.) In 1946, the "Law for Liberation and Militarism" transferred the responsibility for prosecuting war crimes cases to the German government. The United States Army was given a deadline of December 1947 to bring to trial the cases it was investigating. From July 1946 until December 1947, the Army transferred war crimes suspects in custody, who were not yet charged with a particular crime, to German civilian control in order to be tried by German courts. (Ziemke, pp. 22–24.) Of the 15,000 persons arrested as suspected war criminals, only 1,600 were actually tried by the United States Army. (Ziemke, p. 83.)

116. Persons who had served in concentration camps were aggressively sought as suspects because status as a concentration camp guard automatically gave rise to the possibility of a charge of murder, or mass murder. (Ziemke, pp. 33–34.)

117. Defendant was held as a Prisoner of War (POW) from May 1945 until July 1946.

On July 10, 1946, defendant was discharged as a POW and was arrested by United States authorities as a suspected war criminal. (Ziemke, pp. 28–30; P–11 at 16, 21, 22, 23, 34, 37; P–22; P–99.) Defendant knew he was arrested pursuant to the automatic arrest category authorizing the arrest of all persons who were members of the *Waffen – SS Totenkopfverbaende* (Death's Head units). (Schiffer, March 31, 1993, pp. 77, 97.) Defendant would have known he was still under arrest because when he was discharged as a POW, he was not released from custody and not permitted to leave the camp. (Ziemke, pp. 28–30, 52.)

118. On May 13, 1947, defendant completed a form entitled "Military Government of Germany *Fragebogen*" in which he documented his service as a concentration camp guard. Additionally, defendant indicated under section E of this form, requiring him to state whether or not he was a member of any of the organizations listed, that he was a member of the *Waffen –SS*. (P–11 at 2–7.)

119. In June 1947, defendant was transferred to a civilian camp in Nuremburg–Langwasser as a war crimes suspect. At that time only 2,000 war crimes suspects remained at Dachau. (Ziemke, pp. 37–38.)

120. During his detention as a POW and while he was held as a suspected war criminal, defendant variously claimed—both orally, and in writing—to be a citizen of Romania, Germany, and Austria; however, at no point did he claim to be a citizen of the United States. (Callow, pp. 165–170; P–11 at 2, 8, 10, 16, 17, 18, 24, 40.)

121. When defendant was released from civilian internment on December 12, 1947, he remained a war crimes suspect. His release transferred him to a German civilian court for possible trial because the Army was completing its war crimes cases. (Ziemke, pp. 38–39.)

### I. *Defendant's Attempts To Return To The United States*

#### 1. *1948 Visit To Consulate*

122. On March 31, 1948, only 3½ months after his release, defendant contacted the

---

8. At his deposition, defendant insisted that he did not leave Hersbruck with prisoners, but rather only with a small group of guards. (P–14, Vol. II, pp. 53–54.)

American Consulate in Salzburg, Austria and gave a sworn affidavit wherein he admitted that he had served in the Romanian Army and the *Waffen*–SS *Wachmannschaft*, that he had taken oaths to the Romanian King and Adolf Hitler, and that he had been interned as a POW by Allied troops. (P–9 at no. 7.)

123. On September 29, 1949, the consulate prepared a "Certificate of Loss of Nationality of the United States" (hereinafter "certificate of loss") based upon defendant's admitted oath to the King of Romania taken at the time of his Romanian military service. The Certificate of Loss was forwarded to the Department of State, but was never finalized. Although the State Department agreed that defendant had lost his birth citizenship, it sought clarification as to how and when he had expatriated. Before approving the certificate, the State Department asked the Consulate to ascertain whether the defendant acquired Romanian citizenship in his own right by birth or through the acquisition of such citizenship by his father. No further action was taken until defendant made a subsequent application on April 23, 1952. (P–9 at Nos. 6 and 7.)

## 2. *Application Under DPA*

124. In 1948 Congress passed Public Law 774, the Displaced Persons Act (hereinafter "DPA"), which provided for the admission of displaced persons (hereinafter "DP's") to the United States. (Ziemke, p. 41.)

125. Pursuant to Section 13 of the DPA, members of organizations hostile to the United States were prohibited from admission to the United States under the DPA. Lists were compiled indicating those organizations that were deemed hostile to the United States. These lists were referred to as the "Inimical Lists." (Ziemke, pp. 42–43; P–107, P–108.)

126. Persons were investigated by the Visa Screening Section of the CIC to determine whether they could be admitted to the United States under the DPA. The CIC maintained a central registry of war crimes suspects. When a person applied for admission to the United States as a DP, his name was sent to the CIC to determine if it had any record of derogatory information concerning the applicant. If the CIC had derogatory information, then the applicant was denied a visa under the DPA. (Ziemke, p. 43.)

127. Initially, all members of the *Waffen*–SS were precluded from receiving visas under the DPA. In 1951, certain members of the *Waffen*–SS, primarily those persons involved in combat, were made eligible for visas under the DPA. Members of the *Waffen*–SS Death's Head Units, i.e., concentration camp guards, however, remained ineligible to receive DPA visas. Members of the German Army were eligible to receive DPA visas. (Ziemke, pp. 44–46; P–107; P–108; P–109; P–160.)

128. Defendant applied for a DPA visa and was rejected under Section 13 of the DPA after an investigation by the Visa Screening Section of the CIC revealed defendant's CIC file as a war crimes suspect at Dachau. (Ziemke, pp. 46–47; P–8.) Defendant was rejected prior to October 1951. (P–10.) Subsequently, defendant's name was placed on List No. 58 of the Displaced Persons Commission (hereinafter "DPC"), reflecting defendant's rejection under Section 13 of the DPA. (Ziemke, pp. 47–48; P–16.) Defendant was rejected for a DP visa because he was a member of the *Totenkopfverbaende*, an organization on the inimical list, which was found to be part of a criminal organization by the Nuremburg Tribunal. (Ziemke, p. 49.)

## 3. *1952 Application for Registration and Issuance of Certificate of Loss of Nationality*

129. On April 23, 1952, defendant executed an "Application for Registration", "Affidavit by Native or Naturalized American to Explain Foreign Residence" and supplementary affidavit, and "Questionnaire" at the American Consulate in Salzburg, Austria. (P–9 at Nos. 3, 4, and 5.)

130. In the Affidavit by Native or Naturalized American to Explain Foreign Residence and the supplemental affidavit attached thereto, defendant admitted service in the Romanian Army and stated that he had

served in the "German Army (SS Unit)". Defendant further admitted that he had not contacted an American Consulate during the time he resided in Romania. Defendant stated in the supplemental affidavit that he had acquired Romanian nationality through his father and was included on the Certificate of Nationality as a minor child. Defendant further stated in the supplemental affidavit that he willingly served in the Romanian military because he was a national of Romania and, thus, liable to perform army service, and that he did not protest taking an oath of allegiance to the head of the German State. The Questionnaire, to which defendant responded in German, confirms the information provided in the affidavits. Additionally, in the Questionnaire defendant stated that while in the German Army, he served at various places in Germany between 1943 and 1945. Nowhere, in any of these documents did defendant indicate that he served as a concentration camp guard or that he served in Poland during World War II. (P-9, at Nos. 4 and 5.)

131. The consulate recommended that a Certificate of Loss of Nationality be issued to defendant based upon his Romanian Army service at a time when Romania was engaged in hostilities with the United States. (P-9 at No. 4.)

132. On October 17, 1952, the United States Department of State approved the consulate's recommendation and issued a duly executed Certificate of Loss to defendant based upon defendant's Romanian Army service. (P-9, at No. 3.)

133. The Nationality Act of 1940 specified certain acts which constituted expatriating acts, including taking an oath of allegiance to a foreign sovereign. Voluntary service in the Romanian Army, the taking of an oath of allegiance to King Carol II of Romania, voluntary service in the *Waffen*–SS and the taking of an oath of allegiance to Adolf Hitler, are all expatriating acts under the Nationality Act of 1940. (Callow, pp. 140–41, 150.)

134. Defendant's service in the Romanian army and the *Waffen*–SS at a time when Romania and Germany were at war with the United States constituted expatriating acts

pursuant to the Immigration and Nationality Act of 1952. (Callow, pp. 143, 151.)

135. Contemporary standards of review under *Vance v. Terrazas*, 444 U.S. 252, 100 S.Ct. 540, 62 L.Ed.2d 461 (1980) establish an administrative presumption of intent to retain United States citizenship unless there is objective evidence of conduct inconsistent with retention of citizenship. Defendant's Romanian military service and oath of allegiance to King Carol II constitute expatriating acts and conduct inconsistent with the retention of citizenship. (Callow, p. 164.)

136. Defendant has never attempted to appeal or contest this Certificate of Loss.

### 4. *Visa Application*

137. Having been denied the rights and privileges of a United States citizen, defendant executed, under oath, an "Application for Immigrant Visa and Alien Registration" (hereinafter "visa application") and submitted this to the American Consulate at Salzburg, Austria on April 9, 1953. (P-3.)

138. In response to Question 26 of the visa application, defendant stated his places of previous residence were, "1943–1945 German Army; 1945–1946 Prisoner of war, Bad Aibling Germany; 1946–1947 Internee at Dachau and Nuremburg, Germany." Nowhere did defendant state that he was a member of the *Waffen*–SS Death's Head Battalion or that he served as a concentration camp guard in Poland. (P-3.)

139. In response to Question No. 30 of the visa application, defendant stated that he was a former United States citizen and that he had lost his citizenship by serving in the armed forces of a foreign state. (P-3.)

140. Although Question No. 33 of the visa application expressly asks about prior applications for visas, defendant left this space blank. He made no mention of his application for a visa under the DPA and the subsequent denial thereof. (P-3.)

141. On April 9, 1953, the American Consulate at Salzburg, Austria, issued to defendant a non-quota immigrant visa based on his claim that he was a "[f]ormer United States citizen having lost his citizenship under the

provisions of section 401(c) of the Nationality Act of 1940 (54 Stat. 1169), by entering and serving in the forces of a foreign state, and now desires to apply for reacquisition of citizenship under the provisions of Section 327 of the Act." (P-3.)

142. On May 19, 1953, defendant was admitted to the United States at the Port of New York, New York. (P-3.)

## J. *Defendant's Naturalization*

143. On June 17, 1958, defendant filed with the United States Immigration and Naturalization Service (hereinafter, "INS") in Philadelphia an "Application to File Petition for Naturalization," (hereinafter "Application") and a "Statement of Facts for Preparation of Petition" (hereinafter "Statement of Facts"), together comprising INS Form N-400 Application. (P-2.)

144. In 1958, standard procedures and practices were employed by naturalization examiners of the INS in processing naturalization applications and petitions. These standard procedures included application of the Immigration and Nationality Act, the Code of Federal Regulations, INS Operating Instructions and the Nationality Manual. (P-155, pp. 22-24.)

145. Prerequisites for naturalization include that the applicant possess good moral character and attachment to the principles of the Constitution. (P-155, pp. 106-107.)

146. An alien who applied for citizenship by submitting an N-400 application to the Philadelphia office of the INS was scheduled for an interview. At the beginning of the interview, the naturalization examiner placed the applicant under oath. (P-155, pp. 46, 49.) The naturalization examiner then reviewed the N-400 Application with the applicant, going over each and every question, statement and allegation contained therein, checking for correctness, in accordance with INS established practice. Any corrections to be made were noted by a number and confirmed answers were checkmarked. (P-155, pp. 40, 43, 50-51.)

147. On June 17, 1958, defendant appeared before a naturalization examiner at the Philadelphia office of the INS and swore that all the answers given on his Form N-400 Application were true to the best of his knowledge and belief. In accordance with INS practice, defendant reviewed and affirmed under oath all the statements in his application. Additionally, defendant demonstrated his ability to read, write and speak English. (P-2, p. 4; P-20; P-155, p. 61.)

148. At no time during the processing of his naturalization application did defendant either assert his United States citizenship or dispute the earlier finding that he had intentionally relinquished it. Rather, in response to Question No. 5 of the Statement of Facts, which asks, "country of which I am a citizen, subject, or national," defendant responded "Stateless—Last of Romania". (P-2.)

149. The purpose of Questions 10 and 13 on the N-400 Application, was to ascertain whether the applicant was ever arrested or belongs or had belonged to any organization that was subversive or inimical to the best interests of the United States. (P-155, p. 86.)

150. In response to Question No. 13 of the Application, which required defendant to list all organizations in which he had been a member before the last ten years, defendant initially responded that he did not belong to any organization. During the interview with the naturalization examiner that answer was stricken, and defendant responded that he had been a member of the "German Army 1943-1945." Defendant did not list his membership in the *Waffen* –SS *Totenkopfsturmbann.* (P-2; P-155, pp. 91-92.)

151. In response to Question No. 10 of the Application, requesting information on previous arrests in the United States or in any other country, defendant responded that he had never been arrested. (P-2.) In fact, defendant had been arrested and detained as a suspected war criminal and was required to indicate that in response to Question 10. Had the naturalization examiner known of defendant's prior arrest, he would have ordered an investigation. (P-155, pp. 93-94, 97-98.) Such an investigation would have revealed defendant's *Waffen* –SS Death's Head Battalion service.

152. If the naturalization examiner knew that defendant had been a member of the *Waffen*–SS Death's Head Battalion, he would have marked the case for continuance and asked for an investigation. Membership in the *Waffen*–SS Death's Head Battalion would have been a substantial factor in the naturalization examiner's determination. to grant or deny citizenship and would have precluded eligibility for citizenship on the basis of good moral character and attachment to principles of the Constitution. (P–155, pp. 94–96.)

153. Under the procedures, practices and guidelines in place at the time, if a naturalization examiner had discovered that an applicant had represented that he was never arrested, when in fact the applicant had been arrested, a naturalization examiner would have recommended denial of the Petition because the petition lacked good moral character. (P–155, pp. 114–115.)

154. In response to Question No. 23 of the Application, defendant asserted under oath that he was a person of good moral character and had not given false testimony for the purpose of obtaining any benefits under the immigration and naturalization laws. (P–2.)

155. In reliance upon defendant's representation that his citizenship was "stateless, last of Romania," and upon the Certificate of Loss in defendant's immigration file, as well as upon the misrepresentations and omissions in defendant's Application as described in paragraphs 150 and 151 above, the naturalization examiner approved defendant's application. (P–6; P–19; P–155, pp. 60–61.)

156. If the naturalization examiner had determined that defendant had given false statements to the INS in connection with his application to become a naturalized citizen of the United States, his petition for naturalization would have been denied. (P–155, pp. 103–105.)

157. On June 17, 1958, defendant filed a "Petition for Naturalization" No. 212361 (INS Form N–405) with the United States District Court for the Eastern District of Pennsylvania. (P–4.)

158. Defendant swore on the Petition that he was a person of good moral character and attached to the principles of the Constitution and that he was able to read, write and speak English. (P–4 at ¶¶ 14 and 15.)

159. On August 13, 1958, the United States District Court for the Eastern District of Pennsylvania, issued Certificate of Naturalization No. 7993986 to defendant. This certificate states that defendant's nationality was formerly "Romanian." (P–1.)

### K. *Post–Naturalization*

160. On May 17, 1967, defendant applied for and was issued a United States passport. Defendant stated on his passport application that before his naturalization he was a national of Romania. (P–9 at No. 1.)

161. On September 1, 1988, representatives from the Department of Justice interviewed defendant concerning his activities during World War II. At that time, defendant signed a sworn statement, wherein he indicated that he "joined" the Romanian Army and that he had served in concentration camps. (P–13.)

## III. *DISCUSSION*

Before embarking on a lengthy analysis of the somewhat thorny legal issues involved in this case, we feel compelled to comment on the witnesses' credibility, in light of some conflicting testimony.

At the outset, we find much of Schiffer's testimony unbelievable. As set forth in great detail in the Government's Reply Brief, Schiffer's trial testimony in many instances plainly contradicts written and oral statements previously made by him. Often, his testimony from day-to-day was inconsistent and frequently at odds with the documentary evidence. Finally, much of Schiffer's testimony, especially on critical issues, was unsupported and completely self-serving. See Government's Reply Brief, pp. 18–35.[9]

---

9. We also note that, in general, the testimony of former concentration camp guards is notoriously unreliable. Specifically, former camp guards

facing denaturalization frequently claim to have served involuntarily, been stationed only on the outside of the camps themselves, unaware of any

On the other hand, we found all of the Government's witnesses to be highly credible. We were particularly impressed by Dr. Sydnor, whose testimony was beyond reproach. The testimony of the concentration camp survivors was equally impressive and courageous. We found their testimony to be consistent with each other, expert testimony and historical accounts.

## A. *EXPATRIATION GENERALLY*

We begin by reviewing the general principals of law which apply to cases such as this.

In *Afroyim v. Rusk*, 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967), the Supreme Court held that under the Fourteenth Amendment a United States citizen possesses "a constitutional right to remain a citizen ... unless he voluntarily relinquishes that citizenship." *Afroyim*, 387 U.S. at 268, 87 S.Ct. at 1668. In doing so, the Court found that the government has no power to strip an American of his United States citizenship. *Id.* at 263, 87 S.Ct. at 1665. In particular, the Court upon analyzing the language and history of the Fourteenth Amendment as well as expatriation legislation proposed and rejected by Congress, found an undeniable intent of the Amendment's framers to "put citizenship beyond the power of any governmental unit to destroy." *Id.* The Court also recognized the vital importance of United States citizenship:

> [i]n some instances, loss of citizenship can mean that a man is left without the protection of citizenship of any country in the world—as a man without a country. Citizenship in this Nation is a part of a cooperative affair. Its citizenry is the country and the country is its citizenry.

*Id.* at 368, 87 S.Ct. at 1668.

In *Vance v. Terrazas*, 444 U.S. 252, 100 S.Ct. 540, 62 L.Ed.2d 461 (1980), the Supreme Court restated the holding of *Afroyim* that Congress has no "general power, express or implied, to take away an American citizen's citizenship without his assent ... § 1 of the Fourteenth Amendment is 'most reasonably read as defining a citizenship which a citizen keeps unless he voluntarily relinquishes it.' " *Id.* at 259–260, 100 S.Ct. at 545. The Court also elaborated on the "voluntary relinquishment" requirement. Specifically, in *Terrazas*, the Secretary of State argued that a citizen loses his citizenship simply by voluntarily performing an act that Congress has designated as an expatriating act. The Court rejected this argument and found instead that a person loses his citizenship only if he voluntarily commits an expatriating act with the intent to relinquish his citizenship, "whether the intent is expressed in words or is found as a fair inference from proved conduct." *Id.* at 260, 100 S.Ct. at 545. "In the last analysis," the Court said, "expatriation depends on the will of the citizen rather than on the will of Congress and its assessment of his conduct." *Id.* Thus, under *Afroyim* and *Terrazas*, the government has the burden of proving that the defendant performed one of the expatriating acts enumerated by Congress and that he did so with the contemporaneous intent to relinquish his citizenship.[10]

---

mistreatment or punishment of prisoners, unaware of why prisoners are being held and in no way personally involved in the mistreatment of a prisoner. *See, e.g., Kulle v. United States*, 825 F.2d 1188, 1192 (7th Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988). Schiffer's testimony continues in this pattern.

Such claims have generally met with harsh treatment. Claims by a guard that he was unaware of persecution within the camps are common and have been soundly rejected by courts and historians alike as "incredible." *Schellong v. INS*, 805 F.2d 655, 661 (7th Cir.1986), *cert. denied*, 481 U.S. 1004, 107 S.Ct. 1624, 95 L.Ed.2d 199 (1987); (Sydnor March 19, 1993, pp. 75–76) (Dr. Sydnor testified that in his opinion, "it was very common, extremely common for people who had served in the SS who were under investigation in these post-war proceed-

ings to indicate that they had known nothing or knew little or that they had only followed orders."). The credibility of camp guards and their accounts are disregarded or ignored by historians because they lack detail. (Sydnor 3/19/93, p. 74).

10. These principles are codified in section 349 of the Immigration and Nationality Act, 66 Stat. 267, 8 U.S.C. § 1481 which currently provides:

(a) A person who is a national of the United States whether by birth or naturalization, shall lose his nationality by voluntarily performing any of the following acts with the intention of relinquishing United States nationality—

(1) obtaining naturalization in a foreign state upon his own application, or upon an application filed by a duly authorized agent,

■ The applicable standard of proof for establishing expatriation is set forth in 8 U.S.C. § 1481(b), which provides that the government must demonstrate voluntariness and specific intent by a preponderance of the evidence. Section 1481(b) also provides that the voluntariness of the expatriating conduct is presumed. A person opposing expatriation may rebut this presumption by showing, by a preponderance of the evidence, that the act or acts committed or performed were not done voluntarily.[11] There is no presumption, however, that the expatriating act was performed with the intent to relinquish citizenship. *Vance v. Terrazas*, 444 U.S. at 268, 100 S.Ct. at 549. Similarly, there is no presumption of voluntariness with respect to acts which demonstrate specific intent to relinquish citizenship. *Richards v. Secretary of State*, 752 F.2d 1413, 1418–19 (9th Cir.1985); *Kahane v. Secretary of State*, 700 F.Supp. 1162, 1166 (D.D.C.1988). Both the preponderance of the evidence standard and the presumption of voluntariness have been held to be constitutionally permissible. *Vance v.*

*Terrazas,* 444 U.S. at 264–70, 100 S.Ct. at 547–50.

### 1. *Voluntariness*

■ It is well settled that expatriation will not be found if the expatriating act was performed involuntarily or under conditions of duress. *Richards,* 752 F.2d at 1419; *Stipa v. Dulles,* 233 F.2d 551, 555 (3d Cir.1956); *Lehmann v. Acheson,* 206 F.2d 592, 594–95 (3d Cir.1953). A claim of involuntariness or duress is an affirmative defense to be proved by the party opposing expatriation. *Vance v. Terrazas,* 444 U.S. at 269, 100 S.Ct. at 550.

■ An analysis of the case law involving claims of involuntary foreign military service (or service under duress) reveals that in order for the party opposing expatriation to carry his burden, he must establish, by a preponderance of the evidence, that he took steps to avoid service or, alternatively, that such action on his part would have proven meaningless. For example, in *Podea v. Acheson,* 179 F.2d 306 (2d Cir.1950), the

after having obtained the age of eighteen years; or

(2) taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state or a political subdivision thereof after having attained the age of eighteen years; or

(3) entering, or serving in, the armed forces of a foreign state if (A) such armed forces are engaged in hostilities against the United States, or (B) such persons serve as a commissioned or noncommissioned officer; or

(4)(A) accepting, serving in, or performing the duties of any office, post, or employment under the government of a foreign state or a political subdivision thereof after attaining the age of eighteen years, if he has or acquires the nationality of such foreign state; or

(B) accepting, serving in, or performing the duties of any office, post, or employment under the government of a foreign state or a political subdivision thereof after attaining the age of eighteen years, for which office, post, or employment an oath, affirmation, or declaration of allegiance is required; or

(5) making a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state, in such form as may be prescribed by the Secretary of State; or

(6) making in the United States a formal written renunciation of nationality in such form as may be prescribed by, and before such officer as may be designated by, the Attorney

General, whenever the United States shall be in a state of war and the Attorney General shall approve such renunciation as not contrary to the interests of national defense; or

(7) committing any act of treason against, or attempting by force to overthrow, or bearing arms against, the United States, violating or conspiring to violate any of the provisions of section 2383 of Title 18, or willfully performing any act in violation of section 2385 of Title 18, or violating section 2384 of Title 18 by engaging in a conspiracy to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, if and when he is convicted thereof by a court martial or by a court of competent jurisdiction.

11. Section 1481(b) provides in full:

(b) Whenever the loss of United States nationality is put in issue in any action or proceeding commenced on or after September 26, 1961 under, or by virtue of, the provisions of this chapter or any other Act, the burden shall be upon the person or party claiming that such loss occurred, to establish such claim by a preponderance of the evidence. Any person who commits or performs, or who has committed or performed, any act of expatriation under the provisions of this chapter or any other Act shall be presumed to have done so voluntarily, but such presumption may be rebutted upon a showing, by a preponderance of the evidence, that the act or acts committed or performed were not done voluntarily.

plaintiff, a native-born American citizen, sought a declaratory judgment that his service in the Romanian army was not expatriating. To support his claim of involuntary service, Podea established that, prior to service, he repeatedly applied to the American Consulate in Bucharest for a United States passport for the express purpose of avoiding military service. *Podea*, 179 F.2d at 307–08. On each occasion, Podea's application was denied. *Id.* As a result, the court found that "[w]hen the plaintiff was refused a passport by the State Department he was compelled to serve in the Romanian army ..." *Id.*

Similarly, in *Moldoveanu v. Dulles*, 168 F.Supp. 1 (E.D.Mich.1958), a United States citizen by birth petitioned for a judgment declaring him a United States citizen despite having served in the Romanian army and taken an oath of allegiance to the Government of Romania. Before attaining majority, Moldoveanu made inquiry at the United States Consulate at Bucharest about returning to the United States. *Moldoveanu*, 168 F.Supp. at 4. At age twenty one, Moldoveanu received notice that he was being inducted into military service. In response, he protested unsuccessfully that, as an American citizen, he was not subject to military service. Moldoveanu also attempted to secure the aid and intervention of the American Consulate in order to return to the United States. *Id.* Presented with this uncontradicted evidence, the court found "that the plaintiff did not enter voluntarily the military service of Romania" or take voluntarily the oath of allegiance. *Id.* at 5.

■ Duress or involuntary service may be found where the alleged expatriate establishes that he faced a Hobson's choice between asserting United States citizenship and thereby subjecting himself or his family to penal or corporal punishment, on the one hand, or relinquishing his United States citizenship, on the other. *See Nishikawa v. Dulles*, 356 U.S. 129, 137, 78 S.Ct. 612, 617, 2 L.Ed.2d 659 (1958) (Japanese Military Ser-

vice Law provided for imprisonment for evasion); *Pandolfo v. Acheson*, 202 F.2d 38 (2d Cir.1953) (Plaintiff testified that if he had not reported for military service he would have been picked up by the Italian police the following morning);[12] *Dos Reis ex rel. Camara v. Nicolls*, 161 F.2d 860 (1st Cir.1947) (After protesting Portuguese military service, Camara was informed that the only alternative to service in the army was detention in a concentration camp.); *Kamada v. Dulles*, 145 F.Supp. 457 (N.D.Cal.1956) (Plaintiff actually threatened with arrest and imprisonment upon protesting Japanese military service.).

■ An alleged expatriate may also prove duress or involuntary service by demonstrating that he protested military service on the grounds of United States citizenship. *See Acheson v. Maenza*, 202 F.2d 453 (D.C.Cir. 1953); *Podea v. Acheson*, 179 F.2d 306 (2d Cir.1950); *Dos Reis ex rel. Camara v. Nicolls*, 161 F.2d 860 (1st Cir.1947); *Moldoveanu v. Dulles*, 168 F.Supp. 1 (E.D.Mich. 1958); *Kamada v. Dulles*, 145 F.Supp. 457 (N.D.Cal.1956). Failure to protest military service on this grounds, however, does not conclusively establish voluntary service. Rather, even in the absence of a protest or other proof of attempts to avoid service, the alleged expatriate may carry his burden of proof by demonstrating that such a protest or attempt to avoid service would have been meaningless. *See Nishikawa v. Dulles*, 356 U.S. 129, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958) (Efforts to protest military service and seek aid of American officials would have been in vain); *Lehmann v. Acheson*, 206 F.2d 592, 594–95 (3d Cir.1953) (Under pact between Switzerland and the United States, plaintiff was obliged to submit to conscription and American consulate could not intervene on his behalf).

■ Finally, under the law of this Circuit, "[c]onscription into the Army of a foreign government of one holding dual citizenship is

---

12. The Attorney General had previously acknowledged that Italian army service by a dual national could " 'only be regarded as having been taken under legal compulsion amounting to duress' " and that " '[t]he choice of taking the oath or

violating the law was, for a soldier in the army of Fascist Italy, no choice at all.' " *Mandoli v. Acheson*, 344 U.S. 133, 135, 73 S.Ct. 135, 136, 97 L.Ed. 146 (1952).

sufficient to establish prima facie that his entry and service were involuntary." *Lehmann,* 206 F.2d at 594; *contra Acheson v. Maenza,* 202 F.2d 453, 457–58 (D.C.Cir.1953); *Cafiero v. Kennedy,* 262 F.Supp. 140, 146 (D.N.J.1966) (citing *Acheson v. Maenza,* 202 F.2d 453, 458 (D.C.Cir.1953)).[13] This prima facie showing may be rebutted by evidence "that on or after [the date of conscription] [the relevant foreign] law or military practice would have permitted the [alleged expatriate] to secure release, on the ground of his United States citizenship or otherwise." *Perri v. Dulles,* 206 F.2d 586, 589 (3d Cir.1953). Read together, and in light of 8 U.S.C. § 1481(b) as well as the substantial body of case law in this area, we believe *Lehmann* and *Perri* stand for the proposition that the alleged expatriate can rebut the presumption of voluntariness created by § 1481(b) by proving conscription into foreign military service. The Government may, in turn, demonstrate voluntary conduct by proving, among other things, that the alleged expatriate could have secured release from military service but failed to do so. All in all, we believe this requires a district court to do nothing more than to give effect to the presumption of voluntariness created by § 1481(b) and, considering the evidence as a whole, to determine whether the alleged expatriate has rebutted it by a preponderance of the evidence.

13. The Government questions the continued viability of *Lehmann* since it was decided prior to the Supreme Court rulings in *Afroyim* and *Terrazas.* The Supreme Court has recognized that in *Lehmann* the Third Circuit, at the least, regards conscription as creating a presumption of involuntariness which the Government must rebut. *Nishikawa v. Dulles,* 356 U.S. 129, 134 n. 5, 78 S.Ct. 612, 615 n. 5, 2 L.Ed.2d 659 (1958). To the extent that *Lehmann* can be read as creating a rebuttable presumption which overcomes the presumption of voluntariness codified in 8 U.S.C. § 1481(b), we believe that neither *Afroyim* nor *Terrazas* either directly or implicitly overruled *Lehmann.* Furthermore, in expatriation cases, "the facts and the law should be construed as far as is reasonably possible in favor of the citizen." *Schneiderman v. United States,* 320 U.S. 118, 122, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796 (1943). Accordingly, we will permit Schiffer the benefit of this prima facie showing.

## 2. *Specific Intent*

As noted above, a person loses his United States citizenship by voluntarily performing an expatriating act only if "the expatriating act was accompanied by an intent to terminate United States citizenship." *Terrazas,* 444 U.S. at 263, 100 S.Ct. at 546. The Supreme Court has recognized that "intent to renounce" may be evidenced through direct evidence, such as formal renunciation or admission, and also through conduct. *Id.* at 260, 100 S.Ct. at 545. Other courts have similarly recognized that direct evidence of a person's specific intent to relinquish citizenship is rarely available and, consequentially, circumstantial evidence may suffice. *Terrazas v. Haig,* 653 F.2d 285, 288 (7th Cir.1981). In addition, the Ninth Circuit has suggested that:

> [s]ome expatriating acts may be so inherently inconsistent with United States citizenship that persons performing them may be deemed to intend to relinquish their United States citizenship even in the absence of statements that they so intended the acts, or, indeed, even despite contemporaneous denials that they so intended the acts. *Cf. Terrazas,* 444 U.S. at 261, 100 S.Ct. at 545; *Perez v. Brownell,* 356 U.S. 44, 62–84, 78 S.Ct. 568, 578–89, 2 L.Ed.2d 603 (1958) (Warren, C.J., dissenting).

*Richards v. Secretary of State,* 752 F.2d 1413, 1420 n. 5 (9th Cir.1985);[14] *accord King*

14. In *Kahane v. Shultz,* 653 F.Supp. 1486, 1492–93 (E.D.N.Y.1987), Judge Glasser questioned the Ninth Circuit's reading of *Terrazas,* stating "[t]his court would be reluctant to hold that any act, standing alone, conclusively bespeaks its intent," but conceded that "[i]f the act stands alone, with no proof of intent adduced by either side, a court may conclude that the preponderance of the evidence shows an intent to relinquish citizenship." We agree with Judge Glasser that the Ninth Circuit has overstated the evidentiary weight to be accorded to such acts. We believe that an actor's intent to relinquish United States citizenship may be "inferred," rather than "deemed" to exist, from acts "so inherently inconsistent with United States citizenship." By permitting this inference, we are giving effect to the Supreme Court's statement in *Terrazas* that the requisite intent may be "found as a fair inference from the proved conduct." *Terrazas,* 444 U.S. at 260, 100 S.Ct. at 545. This inference, does not shift the burden of proof or allow the government to prove its case by simply proving the commission

*v. Rogers,* 463 F.2d 1188, 1189 (9th Cir.1972). Moreover, specific intent may be established inferentially by evidence demonstrating what steps the defendant did or did not take in connection with the expatriating acts. *See Cafiero v. Kennedy,* 262 F.Supp. 140, 146 (D.N.J.1966).

## B. EXPATRIATING ACTS

We turn now to a discussion of the detailed rules of law and facts in this case.

■ The Government asserts that between 1940 and 1945, Schiffer committed four expatriating acts: (1) voluntarily serving in the Romanian army at a time it was engaged in hostilities with the United States; (2) swearing an oath of allegiance to King Carol II of Romania; (3) voluntarily joining and serving in the *Waffen*–SS, an armed paramilitary force of the Nazi party, at a time that Nazi Germany was engaged in hostilities with the United States; and (4) swearing an oath of allegiance to Adolf Hitler. In his post-trial brief, Schiffer raises several arguments asserting that the Government has failed to carry its burden of proof on the issue of his alleged expatriation. Like his trial testimony, these arguments are confusing and disjointed, often completely contradictory and inconsistent with the evidence.

Schiffer first argues that the Government is limited to the first ground of expatriation listed above. Under *Schneiderman v. United States,* 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943), Schiffer argues, the Government is limited to the matters charged in its Complaint; the Complaint contains no allegations of expatriation and, therefore, only those grounds of expatriation set forth in the Certificate of Loss of Nationality issued by the State Department in 1952 are at issue. This argument is patently frivolous and completely ignores our prior ruling denying defendant's motion to dismiss. In that ruling, we explicitly found that:

[t]he allegations in paragraphs 8 through 20 that Defendant swore allegiance to two different foreign sovereigns, served in the armed forces of two different foreign states, including the armed forces of Germany when the United States was at war with Germany, and that, consequently, the State Department issued a Certificate of Loss of Nationality, support an inference that Defendant relinquished his United States citizenship.

*United States v. Schiffer,* 798 F.Supp. at 1136. Furthermore, this action requires us to review the defendant's relinquishment of his United States citizenship *de novo.* It is not an action to review the State Department's issuance of the Certificate of Loss and should not, therefore, be limited to the grounds listed therein. *See Richards v. Secretary of State,* 752 F.2d 1413, 1418 n. 4 (9th Cir.1985).

Schiffer also argues that: (1) he could not have intended to relinquish his United States birth citizenship because he did not know he was an American citizen; (2) because he was not a citizen of Romania and because he did not voluntarily serve in the Romanian army, he did not expatriate; and (3) there is no proof that he ever took an oath of allegiance to King Carol II or Adolf Hitler. We address each of these arguments below.

### 1. Schiffer's Claimed Lack of Knowledge

■ A United States citizen could not form the intent to relinquish his citizenship if, at the time he committed the expatriating act, he did not know he was a citizen. *Rogers v. Patokoski,* 271 F.2d 858, 861 (9th Cir. 1959); *see Pandolfo v. Acheson,* 202 F.2d 38, 40 (2d Cir.1953) (In view of plaintiff's lack of schooling, his failure to protest military service was not taken as conclusive proof that his induction was voluntary.).

---

of the expatriating act. Instead, we continue to require the government to prove the defendant's intent while recognizing that in proper circumstances the government may carry its burden by relying on the nature of the act performed. As stated in *Terrazas,* " '[o]f course,' any of the specified acts 'may be highly persuasive evidence in the particular case of a purpose to abandon

citizenship.' " *Id.* at 261, 100 S.Ct. at 546 (quoting *Nishikawa v. Dulles,* 356 U.S. 129, 139, 78 S.Ct. 612, 618, 2 L.Ed.2d 659 (1958) (Black, J., concurring)). Such an inference also recognizes the government's heavy burden in proving specific intent, *Id.* at 267, 100 S.Ct. at 548, and that direct evidence of intent is rarely available. *Terrazas v. Haig,* 653 F.2d 285, 288 (7th Cir.1981).

As far as we can tell, Schiffer's lack of knowledge argument is threefold. First, that he lacked the training and education to understand that he was an American citizen by birth. Second, even if he knew he was a citizen by birth, he did not know or understand that he had special privileges, including the right to avoid military service. Third, he did not know that his Romanian army service would jeopardize his American birthright. Def. Post-trial Brief, p. 13. The first two arguments are directly contrary to the overwhelming evidence presented at trial, including defendant's own admissions and testimony. The third argument is irrelevant.

At all times prior to his post-trial brief, defendant has steadfastly maintained that he knew he was an American citizen. At trial, while testifying under oath, Schiffer stated unequivocally that he had known since his teenage years that he was a United States citizen by birth and he understood that, as an American citizen, he was not subject to being drafted into the Romanian army. (Schiffer March 31, 1993, p. 38–40). In his Memorandum in Support of his Motion to Dismiss, defendant likewise asserted that throughout his stay in Romania, "he believed, intended and acted in accordance with his status as a United States citizen." Def. Mem. in Support of Motion to Dismiss, pp. 2, 4. In response to interrogatories propounded by the Government, defendant admitted his awareness, prior to entering the Romanian army, of his status as an American citizen. The defendant also admitted his awareness that his American citizenship provided the basis for him to avoid Romanian military service.[15] Defendant made similar admissions in response to Requests for Admissions propounded by the Government pursuant to Fed.R.Civ.P. 36. (P–158, Defendant's Response to Request for Admissions nos. 6, 7, 12, and 17).[16] Finally, at his deposition, defendant acknowledged that he knew he was an American citizen prior to his entry into the Romanian army. (P–14, Vol. 1, p. 11, lines 5–7; p. 30, lines 8–18; p. 36, lines 17 through p. 37, lines 4).

In light of this overwhelming evidence, Schiffer's cry of "I didn't know," is tenuous at best. We find, beyond any doubt whatsoever, that defendant knew he was an American citizen by birth prior to entering the Romanian army and that he knew he could avoid military service on this ground.

Schiffer's claim that he did not know that his Romanian army service would jeopardize his American birthright, has no relevance in law. As the Ninth Circuit properly stated in *Richards v. Secretary of State*, 752 F.2d 1413, 1420 (9th Cir.1985), "we do not think that knowledge of expatriation law on the part of the alleged expatriate is necessary for loss of citizenship to result." This statement

---

**15.** In the Government's Second Set of Interrogatories (P–158), the defendant was asked in Interrogatory No. 2 to:

Describe in detail each and every communication you had with any person from the time you returned to Romania to the time you were naturalized, wherein you indicated or stated you were an American.

The defendant's response included:

(k) I do not know the individual's name, but when I reported to military training, as all residents of Rumania were required to do by their 21st birthday, I told the military person in charge that I wanted to be exempt from service because I was an American citizen, and because I was the only son of my widowed mother.
. . . .

(n) I complained to all personal involved in drafting me into the military that I was an American but to no avail.
. . . .

(t) I am, and have always been, proud of my American citizenship, and have told anyone who asked, or had a reason to know. I told everyone in the military, as a means of avoiding all military service, that I was an American. . . .

**16.** We find these responses to be particularly compelling evidence of the defendant's knowledge and awareness of his United States citizenship and resulting rights. As Judge Freedman of this court stated:

An answer to a request under Rule 36 is unlike a statement of fact by a witness made in the course of oral evidence at a trial, or in oral pre-trial depositions, or even in written answers to interrogatories. It is on the contrary a studied response, made under sanctions against easy denials, to a request to assert the truth or falsity of a relevant fact pointed out by the request for admission. . . . [R]equests for admission, although answered under the oath of a party, are normally made under the direction and supervision of counsel, who has full professional realization of their significance.

*McSparran v. Hanigan*, 225 F.Supp. 628, 637 (E.D.Pa.1963), *aff'd*, 356 F.2d 983 (3d Cir.1966).

simply recognizes that a citizen could form the requisite intent without specific knowledge of the law governing his conduct. In other words, knowledge that his conduct may result in loss of citizenship is not a necessary element to forming the intent to terminate citizenship. The evidence adduced at trial, as discussed below, conclusively established that Schiffer intended to relinquish his United States citizenship when he willingly entered the Romanian army. This intent is clearly demonstrated with or without proof of his knowledge of the United States laws governing expatriation.[17]

### 2. Schiffer's Involuntary Service Claim [18]

■ Schiffer also argues that he was involuntarily conscripted into the Romanian army and the *Waffen* –SS under the threat of force and imprisonment, and that the oaths taken followed directly from his involuntary service.[19] We find that the record does not support Schiffer's claim and, as a result, Schiffer has failed to rebut the presumption that the acts were performed voluntarily. Moreover, we conclude that even without the benefit of any presumption, the record in this case clearly establishes the voluntariness of Schiffer's acts, including his willful and voluntary service in the Romanian army and the *Waffen* –SS, and the voluntary taking of an oath of allegiance to King Carol II of Romania and Adolf Hitler, by a preponderance of the evidence.

Assuming *arguendo,* the continued vitality of *Lehmann v. Acheson,* 206 F.2d 592 (3d Cir.1953) (discussed above), defendant has failed to establish that he was "conscripted" into the Romanian army. The documentary evidence (P–23, P–17, P–9 no. 4) and the expert testimony (Stanoiu March 18, 1993, pp. 95–95 and 99–100) adduced at trial affirmatively established that Schiffer was recruited and inducted into the Romanian army. Even had he established conscription, Schiffer's prima facie showing was clearly rebutted by the Government's uncontradicted proof that under Romanian law in effect at the time, Schiffer would have been permitted "to secure release on the grounds of his United States citizenship." *Perri v. Dulles,* 206 F.2d 586, 589 (3d Cir.1953).

Schiffer's claim that he was threatened with force and imprisonment are likewise without support. The sole basis for this claim is his unsubstantiated testimony.[20] In

---

17. In *United States v. Matheson,* 532 F.2d 809, 815 (2d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976), the Second Circuit stated that "it would be unfair to strip an individual of his American birthright when he honestly but mistakenly believed that his conduct did not compromise his legal status as a United States citizen or as a dual national." Although in some circumstances, evidence of a mistaken belief in the law may compel a conclusion that the alleged expatriate lacked the specific intent to relinquish his citizenship, this is not the case. Schiffer has presented no evidence of any such mistaken belief, nor in all reasonableness could he. As discussed below, other than perhaps in the circumstance of a civil war, it is inconceivable to us that a person could wage war against a country in which he intends to maintain citizenship.

18. Schiffer makes a vague contention that the Government failed to prove that he had an opportunity to exercise his rights as a United States citizen. This argument misses the mark and confuses the burden of proof. Under 8 U.S.C. § 1481(b) the Government was entitled to the presumption that Schiffer voluntarily entered the Romanian army once it demonstrated that he had indeed done so. It was Schiffer's burden then to rebut this presumption by introducing evidence, for example, of duress.

19. Schiffer denies ever taking an oath to either King Carol II or Adolf Hitler and also claims that the Government presented no evidence to prove that he ever took these oaths. Def. Post-trial Brief, p. 9. Defendant throughout his brief confuses "evidence" with "direct evidence." Although there is no direct evidence that Schiffer took these oaths, there is overwhelming circumstantial evidence to support our finding that he did so. See Findings of Fact Nos. 15, 26, 63. We find documentary evidence prepared by the defendant, or on information provided by the defendant under oath, shortly after the war to be far more compelling and inherently reliable than his present unsupported and self-serving testimony when facing loss of citizenship.

20. The relevant portion of Schiffer's trial testimony follows:

Q: When you reported for duty ...
A: Yes.
Q: ... at the Rumanian military ...
A: Yes.
Q: ... did you have a choice?
A: No.
Q: What do you think would have happened to you if you had not gone?
A: It was wartime.
....

general, as is demonstrated throughout this decision, much of the defendant's trial testimony is contradictory and patently incredible; accordingly, we give little credence to this claim. Indeed, Schiffer admitted on cross-examination that he knew of no SS members who were shot by the SS and that his only knowledge of such things was based on hearsay. (Schiffer March 31, 1993, pp. 100–101). At his deposition, Schiffer had testified that he was not aware of people being punished for disobeying orders. (P-14, Vol. 3, p. 22). Nonetheless, even despite the existence of real or imagined threats, the evidence demonstrates that Schiffer served in the Romanian army willingly and without reservation.[21] The records do not support Schiffer's claim that he protested military service as being an American citizen,[22] nor does his army records reflect any protest. (P-17 ("present, without protest"); P-18, col. 10 ("Present, without complaint")). To the contrary, Schiffer admitted under oath that he did not protest service because "being a Romanian national and living in that country, I was liable to such service." (P-9 no. 4 (4/23/52 Affidavit)).[23] Accordingly, we find that Schiffer was not forced into military service involuntarily over his protest, against

his will or under threats of force or imprisonment.

In addition, Schiffer has not proven that protest would have been meaningless. See *Lehmann v. Acheson*, 206 F.2d 592 (3d Cir. 1953). Instead, the Government produced uncontradicted evidence that had he protested service on the grounds of his United States citizenship, he could have avoided military service. (Stanoiu March 18, 1993 pp. 95–96). Furthermore, there were other options available to Schiffer which he intentionally chose not to pursue. As in *Cafiero v. Kennedy*, 262 F.Supp. 140 (D.N.J.1966), Schiffer made no attempt to protest his military service to the American Legation in Bucharest or otherwise seek their aid or intervention. He did not attempt to obtain a passport or leave the country. Had he done so, even if such attempts had proven fruitless, we would be compelled to find his service involuntary. See *Moldoveanu v. Dulles*, 168 F.Supp. 1 (E.D.Mich.1958). This was not the case. Schiffer's failure to protest or otherwise attempt to avoid military service, or alternatively prove that such protests or attempts would be in vain, firmly establishes

> Q: Could you elaborate on that? What would have happened to you ...
> A: Whatever ...
> Q: ... if you didn't go?
> A: ... the consequences were at that time. You could have been shot or incarcerated [sic] or whatever, you know.
> (Schiffer March 30, 1993, pp. 76–79).

21. We note that two courts have recognized that it was a criminal offense in Romania to claim another nationality in order to escape military service if that claim was not sustained and a second claim to foreign citizenship was made. *Podea v. Acheson*, 179 F.2d 306, 308 (2d Cir. 1950); *Moldoveanu v. Dulles*, 168 F.Supp. 1, 5 (E.D.Mich.1958); (P-23, p. 27). While this is undoubtedly true, this penal provision does not apply to Schiffer and there is no reason for us to believe that Schiffer would have been unable to sustain his claim of American citizenship. Moreover, the punishment for unsustained claims of foreign citizenship was incarceration from four months to one year. (P-23, p. 27)

22. Defendant objected to military service on the grounds that he was the only son of a widow and entries in his military records reflect this objection. His claims in response to interrogatories and requests for admissions that he likewise ob-

jected on the grounds of his United States citizenship are not reflected in his military records and, therefore, are simply not credible. *Cf.* Fed. R.Evid. 803(7). Also, at trial Schiffer admitted that he never even informed the Romanian army personnel that he was an American citizen. (Schiffer 3/30/93, pp. 39–40, 43). We can not accept Schiffer's claim in his post-trial brief that he asserted his American citizenship by telling military recruiters that he was born in the United States. (See Def. Response to Plaintiff's Proposed Findings of Fact, ¶ 13).

23. Defendant claims that he cannot be held accountable for statements made in this document because it was written in English and at that time he was not literate in English. Schiffer also argues that "the basis for the document has not been offered into evidence." Def. Response to Plaintiff's Proposed Findings of Fact, p. 9. These arguments are unpersuasive. The document qualifies as an ancient document under Fed. R.Evid. 901(b)(8) and is therefore self-authenticating. Fed.R.Evid. 902(3); *United States v. Koziy*, 728 F.2d 1314, 1321–22 (11th Cir.), *cert. denied*, 469 U.S. 835, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984). In addition, the Questionnaire accompanying the affidavit, to which defendant responded in German, confirms the information provided in the affidavit.

that his service in the Romanian army was voluntary.

█ We similarly find that Schiffer's *Waffen* –SS service and oath of allegiance to Adolf Hitler were voluntary. Schiffer's claim that he was involuntarily conscripted into the *Waffen* –SS is belied by expert testimony and documentary evidence establishing that under the Romanian–German agreement allowing the recruitment of *Volksdeutsche* (ethnic Germans), (1) ethnic Germans of Romanian nationality or citizenship had three options: they could join the *Wehrmacht*, serve in the *Waffen* –SS or remain in the Romanian army (Sydnor March 16, 1993, p. 74); (2) that service in the *Wehrmacht* or *Waffen* –SS was voluntary and that those "wishing to enlist" were to report to a local recruiting center where they were to execute or present a written declaration unconditionally stating that their service was voluntary (Sydnor March 16, 1993, p. 80; P–81, ¶ 3); and (3) that no sanctions would be imposed by anyone against those not wishing to enlist. (P–81, ¶ 3).[24] In fact, certain ethnic Germans of Romanian nationality were not permitted to enlist. (P–81, ¶ 2(a)–(g)). Schiffer's military records reflect that he enrolled in the *Waffen* –SS pursuant to this agreement. (P–17; P–18). A record was made of his declaration that service was voluntary. (P–15; Sydnor March 16, 1993, p. 87, lines 10–14 and p. 88, lines 4–8). Accordingly, we find that defendant voluntarily joined the *Waffen* –SS. We also find that he willingly swore an oath of allegiance to Adolf Hitler. (Sydnor March 19, 1993, pp. 5, 88; P–9 nos. 4, 5, and 7).[25]

### 3. *Specific Intent to Relinquish*

█ The Government may prove the specific subjective intent required for expatriation "by evidence of explicit renunciation, acts inconsistent with United States citizenship, or by 'affirmative voluntary act[s] clearly manifesting a decision to accept [foreign] nationality.' " *King v. Rogers*, 463 F.2d 1188, 1189 (9th Cir.1972) (citations omitted). Specific intent may also be proven by evidence of what steps the alleged expatriate did or did not take in connection with his expatriating acts. *Cafiero v. Kennedy*, 262 F.Supp. 140, 146 (D.N.J.1966). Such proof need only establish intent to relinquish by a preponderance of the evidence. 8 U.S.C. § 1481(b).

█ We find Schiffer's intent to renounce his United States citizenship was manifested by his conduct prior to and upon entering and serving in the Romanian army and swearing allegiance to King Carol II, his conduct upon voluntarily entering and serving in the *Waffen* –SS and swearing allegiance to Adolf Hitler, and his conduct immediately following the war.

At least from his teenage years, Schiffer knew that he was an American citizen and, as such, was exempt from military service. Schiffer also knew that the United States maintained a diplomatic presence in Romania. Despite this knowledge, at no time did Schiffer contact the United States Legation in Bucharest to obtain advice regarding his rights and obligations as a citizen living abroad or attempt to obtain a passport. *See Podea v. Acheson*, 179 F.2d 306 (2d Cir. 1950); *Moldoveanu v. Dulles*, 168 F.Supp. 1 (E.D.Mich.1958). When called for military service, Schiffer, in the face of his knowledge that he was not obligated to serve, registered and was inducted into the Romanian army. He did not protest this service either to the Romanian military personnel or to the United States Legation. He did not seek the aid or intervention of the Legation, attempt to leave the country, or otherwise attempt to avoid military service. *Id.* In sum, Schiffer failed to take any action whatsoever despite knowing that Romania was at war with the

---

**24.** The historical context provided by Dr. Sydnor regarding the Nazi's prior unsuccessful use of strong-arm recruiting tactics in Hungary lend persuasive support to this documentary evidence and undermine any assertion that the language used was merely lip service. (Sydnor March 16, 1993, pp. 81–82).

**25.** We reach this conclusion, without the benefit of the presumption created by 8 U.S.C.

§ 1481(b), to provide support for our conclusion below that Schiffer voluntarily joined the Romanian army with the intent to relinquish his United States citizenship. *See Richards v. Secretary of State*, 752 F.2d 1413, 1418–19 (9th Cir.1985) (There is no presumption of voluntariness with respect to acts demonstrating specific intent to relinquish citizenship.).

United States. (Schiffer March 31, 1993, p. 63). We can think of no conduct more repugnant to an intent to retain American citizenship or more demonstrative of an intent to relinquish American citizenship than voluntary service in the armed forces of a country at war with the United States. *Cf. In re Sittler*, 197 F.Supp. 278, 284 (S.D.N.Y.1961) (In denying the naturalization petition of a native-born United States citizen who had expatriated, the court stated, "[n]or, short of treason, could there be a deeper enmity to the good order and happiness of the United States than to wage war upon her on the side of the enemy."), *aff'd sub nom. Sittler v. United States*, 316 F.2d 312 (2d Cir.1963), *cert. denied*, 376 U.S. 932, 84 S.Ct. 702, 11 L.Ed.2d 652 (1964). We believe that Schiffer's conduct in voluntarily joining the Romanian army is so obnoxious to an intent to retain United States citizenship that, in the absence of credible proof to the contrary, we can infer his intent to relinquish his United States citizenship.[26]

Schiffer's subsequent conduct, although not contemporaneous with his entry and service in the Romanian army, present additional demonstrative evidence probative of his intent to relinquish his American citizenship. Specifically, Schiffer voluntarily entered into and served in the *Waffen*–SS, an armed paramilitary force of the Nazi party, an organization adjudged by the Nuremburg Tribunal to be a criminal organization. The concentration and labor camps, such as those Schiffer worked at as a guard, were important cogs in the German war machine and held an enormous significance for the German war effort by supplying valuable slave labor. The population of concentration camps included American citizens and POW's. The actions of concentration camp guards, such as Schiffer, in guarding prisoners, including Americans, was utterly inconsistent with an intent to retain United States

citizenship. Schiffer's oath of allegiance to Adolf Hitler was similarly inconsistent.

Finally, Schiffer's conduct following his arrest by American troops sheds some light on his state of mind in 1941. During his over two-year incarceration as a POW and war crimes suspect, Schiffer alternatively claimed Romanian, Austrian and German citizenship. (P–11 pp. 8, 10, 16–18, 24, 29, 33 and 40). *See King v. Rogers*, 463 F.2d 1188, 1189–90 (9th Cir.1972) (Evidence of post-expatriation conduct, including claims of British and Israeli citizenship relevant to intent to renounce United States citizenship.). Not once while in the custody of American authorities did Schiffer assert or claim United States citizenship.

### 4. Schiffer's Romanian Citizenship Claim

Finally, Schiffer argues that his Romanian army service, even if voluntary and done with the intent to relinquish his United States citizenship, could not result in his expatriation under § 401(c) of the Nationality Act of 1940, 54 Stat. 1168[27] because he was not a Romanian national. Defendant's argument is based upon the last entry in his Romanian military record, dated December 7, 1948, which states that he was "DEPRIVED OF RUMANIAN CITIZENSHIP." (P–18). According to Schiffer, this entry "evidences clearly that Schiffer did not have or acquire Rumanian citizenship during, or as a result of his service in the Rumanian military." Def. Post-trial Brief, p. 13. We disagree. This statement is ambiguous and, at best, can be interpreted as showing only that prior to 1948, Schiffer was a Romanian citizen. Furthermore, the expert testimony introduced at trial clearly established that Schiffer obtained Romanian citizenship derivatively through his father. (Stanoiu March 18, 1993, p. 94). Schiffer himself, at various times subsequent to his Romanian army service, claimed Romanian citizenship. (P–11; P–9

---

26. Contemporaneous with this service, Schiffer voluntarily took an oath swearing allegiance to King Carol II. Because the Government has not provided the text of this oath, we cannot determine whether it provides a separate and independent ground for expatriation. *See Acheson v. Maenza*, 202 F.2d 453, 456–57 (D.C.Cir.1953).

27. Section 401(c) provides that:

> [e]ntering, or serving in, the armed forces of a foreign state [is an expatriating act] unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state.

no. 4). Accordingly, this argument is without merit.

In conclusion, we find that certainly by late 1943 Schiffer was no longer a citizen of the United States. The Government has proven by a preponderance of the evidence (indeed, beyond all doubt) that Schiffer voluntarily entered into and served in both the Romanian army and the *Waffen*–SS, and that he did so with the specific intent of relinquishing his United States citizenship.

## C. *DENATURALIZATION*

 Having found that Schiffer lost his birthright citizenship, we now decide whether he may retain the citizenship he acquired by naturalization.

Courts have long recognized the priceless benefits of United States citizenship and the dire consequences of its loss. In *Schneiderman v. United States,* 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943), the Supreme Court stated that loss of citizenship

> is more serious than a taking of ones's property, or the imposition of a fine or other penalty. For it is safe to assert that nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to exaggerate its value and importance. By many it is regarded as the highest hope of civilized men.

*Id.* at 122, 63 S.Ct. at 1335. These words are as true today as they were in the war-charged atmosphere of 1942. In *Klapprott v. United States,* 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266, *modified,* 336 U.S. 942, 69 S.Ct. 384, 93 L.Ed. 1099 (1949), the Court went even further, stating

> [d]enaturalization consequences may be more grave than consequences that flow from conviction for crimes.... This Court has long recognized the plain fact that to deprive a person of his American citizenship is an extraordinarily severe penalty.

*Id.* 355 U.S. at 611–12, 69 S.Ct. at 389.

 As a result, the Government is straddled with a heavy burden of proof in denaturalization proceedings. *Fedorenko v. United States,* 449 U.S. 490, 505, 101 S.Ct.

737, 747, 66 L.Ed.2d 686 (1981). To justify revocation of citizenship, the Government's evidence

> must be "clear, unequivocal, and convincing" and not leave "the issue in doubt." ... Any less exacting standard would be inconsistent with the importance of the right that is at stake in a denaturalization proceeding.

*Id.* at 505–06, 101 S.Ct. at 747 (citations omitted).

 Section 1451(a) provides that a certificate of naturalization will be revoked and set aside where it is later found to have been "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation." These two grounds for revocation are distinct, and each requires pleading and proof of different facts. Citizenship is "illegally procured" if at the time of naturalization an applicant failed to strictly comply with any of the statutory prerequisites for naturalization. *Fedorenko,* 449 U.S. at 506, 101 S.Ct. at 747; *United States v. Kowalchuk,* 773 F.2d 488, 494 (3d Cir.1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 303 (1986). The Government contends that Schiffer illegally procured his citizenship (Counts I–III) and also that he procured his citizenship by concealment or willful misrepresentation of a material fact (Count IV).

### 1. *Illegal Procurement*

The statutory prerequisites for citizenship are set forth in Section 1427 of the Act. In order to be naturalized as a United States citizen, one has to be lawfully admitted for permanent residence, be of good moral character, be attached to the principles of the United States Constitution, and be well disposed towards the good order and happiness of the United States. 8 U.S.C. § 1427(a). In order to be lawfully admitted one must have entered this country pursuant to a valid unexpired visa. *Fedorenko,* 449 U.S. at 514–15, 101 S.Ct. at 751. Thus, if a naturalized citizen lacked good moral character or if he unlawfully entered the country, his citizenship was illegally procured and must be set aside.

The Government alleges that Schiffer failed to meet either of these conditions. Specifically, the Government claims that Schiffer lacked the good moral character required to obtain citizenship and, hence, to obtain a valid visa.[28] The Government claim arises from Schiffer's participation in the Nazi program of persecution (Count II) and the false testimony he gave when he concealed and misrepresented facts to obtain his citizenship (Count III).[29] In determining good moral character, "the court shall not be limited to the petitioner's conduct during the five years preceding the filing of the petition, but may take into consideration as a basis for such determination the petitioner's conduct and acts at any time prior to the period." 8 U.S.C. § 1427(e).

### a. *Lack of Good Moral Character/Persecution*

It is uncontroverted that Schiffer, as a member of the *Waffen*–SS Death's Head Battalion, served as an armed guard at the Sachsenhausen, Trawniki, Majdanek and Hersbruck concentration camps. Moreover, the evidence has clearly established that he participated in the prisoner evacuation from Majdanek to Auschwitz and the death march from Hersbruck to Dachau. The Government presented extensive evidence concerning the history of the Nazi regime and its plan to systematically exterminate all those considered enemies of the state, as well as groups it determined to be racially and socially inferior or undesirable. Among those incarcerated at camps in which Schiffer served included Jews, Gypsies, Jehovah's Witnesses, political dissidents, homosexuals and "asocials." Each category of prisoner was forced to wear a colored triangle which designated their reason for incarceration: professional criminals, green; Jehovah's Witnesses, purple; homosexuals, pink; political

prisoners, red; asocials, black; Jews, two yellow triangles inverted on each other to form the Star of David. The Government also presented the expert testimony of Dr. Charles Sydnor,[30] who testified that the Death's Head Battalion was organized as part of the armed SS for the purpose of guarding concentration camps. Dr. Sydnor also testified extensively concerning guard duties and the essential role that guards played in persecution at concentration camps. Specifically, guard duties included escorting prisoners to and from work sites, and the keeping of prisoners. Camp guards carried a rifle and ammunition and were trained to shoot at prisoners who attempted to escape. In addition, Dr. Sydnor testified about the subhuman condition of the camps at which Schiffer was a guard. Dr. Sydnor recounted tales of mass death by starvation, exhaustion, beatings, exposure, disease, bizarre medical experiments and murder, in these camps. For example, we heard testimony that during the period when Schiffer was a guard at Hersbruck, the average life expectancy of a prisoner was less than two months. The causes of death included exhaustion, typhus, malnutrition, exposure and murder.

We also heard first hand accounts from surviving inmates of these camps, describing the harsh treatment to which prisoners were subjected by the guards. We heard testimony from Vivian Chakin regarding the conditions at the Trawniki concentration camp. Ms. Chakin recounted the bone-chilling saga of the male prisoners who were brought to Trawniki in November, 1943 to disinter and burn the bodies of almost 6,000 prisoners murdered by the Nazis in "Operation Harvest Festival," and who were then shot themselves. Ms. Chakin also described the trek from Majdanek to Auschwitz, including a one week march in which prisoners were physi-

---

**28.** The reasoning, albeit circular, is that § 1182(a)(22) declares ineligible for a visa all applicants who are "ineligible to citizenship." An applicant who lacks good moral character is "ineligible to citizenship" under § 1427(a)(3) and, thus, not entitled to a visa.

**29.** Persons who have given false testimony for the purpose of obtaining benefits under the Act lack, as a matter of law, the good moral character required for obtaining citizenship. 8 U.S.C.

§ 1101(f)(6); *United States v. Schellong,* 547 F.Supp. 569, 573 (N.D.Ill.1982), *aff'd,* 717 F.2d 329 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).

**30.** Dr. Sydnor has dedicated his professional career to studying and teaching German history, with special emphasis on the Nazi program of persecution and the role concentration camp guards played in that persecution.

cally and verbally abused by the camp guards, subjected to harsh weather without protection and assaulted by guard dogs. Isaak Fenster, a Hersbruck survivor, testified that the camp was "a hell," without running water, meager supplies, abhorrent work conditions and twelve hour work days. Mr. Fenster also described how the emaciated figures marching to and from the Happburg site were referred to by the prisoners as "muehsalmann ... people who look close to death." Mr. Fenster detailed a forced march from Flossenburg, in which prisoners who could no longer march were shot by SS guards. By his estimate, only thirty percent of the prisoners survived this march. (Fenster March 18, 1993, pp. 59, 63, 66, 70–73). Mr. Leon Messer described the day to day horrors of the Sachsenhausen camp.

The evidence clearly established that the purpose of these camps was to support the Nazi program of persecution by confinement, brutalization and extermination of innocent men, women and children who were imprisoned solely because of their race, religion, national origin, sexual preference or political opinion. Millions died as a result of the Nazi program of persecution. That the armed concentration camp guards played a major role in the persecution of these persons and in attaining the Nazi goal of annihilation is beyond dispute. Indeed, the guards served as an important mechanism to ensure the successful completion of this goal, which is the very reason for the existence of the camps at which the defendant served. As one court has recognized

Nazi concentration camps were places of persecution; individuals who, armed with guns, held the prisoners captive and prodded them into forced labor with threats of death or capital punishment cannot deny that they aided the Nazi in their program of racial, political, and religious oppression.

*Schellong v. INS*, 805 F.2d 655, 661 (7th Cir.1986), *cert. denied*, 481 U.S. 1004, 107 S.Ct. 1624, 95 L.Ed.2d 199 (1987).

The evidence clearly and unequivocally established that defendant, as an armed *Waffen*–SS guard at Sachsenhausen, Trawniki, Majdanek and Hersbruck concentration camps, was an active participant in the persecution occurring at these camps in that he helped prevent inmates from escaping the grotesquely inhumane condition there.

The evidence is equally clear that had the naturalization examiner been aware of Schiffer's extensive concentration camp guard service, Schiffer would have been denied United States citizenship. Eugene Cole, the General Counsel and Assistant District Director for Citizenship for the INS in Philadelphia from 1955 to 1965, testified that a naturalization applicant had to possess good moral character and had to be attached to the principles of the Constitution in order to be approved for naturalization. Cole's testimony was unequivocal that if an applicant had revealed his wartime service as a *Waffen*–SS concentration camp guard, his application for naturalization would have been denied because such wartime activity would compel the conclusion that he was not attached to the principles of the Constitution and did not possess the good moral character required for naturalization.

▇ To further support their position, the Government relies on a series of cases decided under the Displaced Persons Act holding that uniformed, armed concentration camp guards "assisted the enemy in persecuting" civilians within the meaning of that Act. *Fedorenko*, 449 U.S. at 513 n. 34, 101 S.Ct. at 750 n. 34.[31] Under these cases, it is irrelevant whether the guard voluntarily joined the SS and whether he ever personally committed any atrocities. At issue here, however, is not whether Schiffer's concentration camp guard service rendered him ineligible to obtain a visa under the DPA, but

**31.** See *Kairys v. INS*, 981 F.2d 937 (7th Cir. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1832, 123 L.Ed.2d 460 (1993); *United States v. Schmidt*, 923 F.2d 1253 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991); *Kulle v. INS*, 825 F.2d 1188 (7th Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988); *Schellong v. INS*, 805 F.2d 655 (7th Cir.1986), *cert. denied*, 481 U.S. 1004, 107 S.Ct. 1624, 95 L.Ed.2d 199 (1987); *United States v. Kairys*, 782 F.2d 1374 (7th Cir.), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986); *United States v. Osidach*, 513 F.Supp. 51 (E.D.Pa.1981).

whether that service demonstrates by clear, unequivocal and convincing evidence that Schiffer lacked the requisite good moral character at the time of his naturalization. We do not agree that the standard applied under the DPA cases applies to an analysis of a person's moral character in denaturalization cases. Rather, the very essence of meaningfully determining a person's moral character is not simply to look at their status or title, *see Johnson v. United States,* 186 F.2d 588, 590 (2d Cir.1951) ("Nor is it possible to make use of general principles, for almost every moral situation is unique."), but to examine the actor's conduct and the circumstances surrounding it. We refuse to revoke citizenship by finding that a person prima facie lacks good moral character simply because he held the title of concentration camp guard without some further showing that the person engaged in some morally reprehensible conduct and did so voluntarily. *Cf. In re DeLeo,* 75 F.Supp. 896, 900 (W.D.Pa.1948) ("'Good moral character' ... results from acts and conduct of the individual ..."); *Forbes v. Brownell,* 149 F.Supp. 848, 851 (D.D.C.1957) (Conviction of a crime that does not require *mens rea* does not, as a matter of law, involve moral turpitude.). To hold otherwise would be to lower the Government's burden of proof. For instance, a person who was forced into service under a constant threat of death might not lack good moral character simply because of his service. Similarly, it is not entirely impossible that a member of the SS had responsibilities, such as minuscule clerical duties, so insignificant and unrelated to the Nazi program that his contribution is negligible. *See United States v. Sprogis,* 763 F.2d 115 (2d Cir.1985). In that instance, a court could determine that the person's moral character had not been impugned. Furthermore, the DPA did not establish a yardstick for measuring moral turpitude.

Our decision, however, does not rest on Schiffer's status alone. We have previously determined by clear, unequivocal evidence that Schiffer's *Waffen* –SS service was voluntary. Moreover, the evidence demonstrates beyond all doubt that Schiffer in fact personally participated in acts of persecution when, armed with a loaded rifle, he escorted prisoners to and from the Happburg slave labor site, and guarded them while they were forced to dig tunnels under dangerous and inhumane conditions. In addition, by Schiffer's own admission (P–11 at 25, 32), he participated in the "death march" of approximately 15,000 prisoners from Hersbruck. Prisoners on this march who could not continue to march were shot by SS guards or collapsed by the road and were left to die. These deeds, independent of his *Waffen* –SS service, demonstrate clearly and unequivocally that, at the time of naturalization, Schiffer lacked the necessary good moral character. *United States v. Linnas,* 527 F.Supp. 426, 439 (E.D.N.Y.1981) (Court found that the defendant "did not possess the required good moral character because of his voluntary involvement in the unjustifiable atrocities committed against men, women and children."), *aff'd,* 685 F.2d 427 (2d Cir.), *cert. denied,* 459 U.S. 883, 103 S.Ct. 179, 74 L.Ed.2d 146 (1982); *United States v. Osidach,* 513 F.Supp. 51, 103 n. 31 (E.D.Pa.1981) (Court found that the defendant "lacked the good moral character [when he naturalized] required to secure a valid grant of citizenship because of his past service as a willing member of the Ukrainian police and as a participant in acts of persecution as an interpreter and street policemen."); *United States v. Koziy,* 540 F.Supp. 25, 35 (S.D.Fla.1982) ("Both Mr. Koziy's employment with the Ukrainian police and his participation in acts of persecution and murder of civilians each demonstrate, independently of the other, that he lacked the good moral character required for citizenship."), *aff'd,* 728 F.2d 1314 (11th Cir.), *cert. denied,* 469 U.S. 835, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984).

**b. Lack of Good Moral Character/False Testimony**

In *Kungys v. United States,* 485 U.S. 759, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988), the Supreme Court held that false testimony under § 1101(f)(6) refers to oral statements under oath made with the subjective intent of obtaining immigration benefits. *Id.* at 780, 108 S.Ct. at 1551. Good moral character is lacking whenever there is a subjective intent to deceive. *Id.* In a naturalization proceeding, the burden is on the ap-

plicant to show his eligibility for citizenship. *Berenyi v. INS*, 385 U.S. 630, 638, 87 S.Ct. 666, 671, 17 L.Ed.2d 656 (1967). The Government is entitled to know of any facts that may bear on an applicant's statutory eligibility for citizenship. *Id.* Mr. Cole testified that, consistent with INS standard practice, a naturalization examiner would have placed Schiffer under oath, had him swear to tell the truth, and then would have reviewed each question and answer on his application with him orally. Mr. Cole further testified that if it was determined by a naturalization examiner that an applicant had made false statements in his attempt to become a naturalized citizen, his petition for naturalization would have been denied.

The Government contends that Schiffer gave false testimony when (1) in response to Question No. 10 he answered that he had never been arrested; (2) in response to Question No. 13 he failed to list his *Waffen* – SS Death's Head Battalion service;[32] and (3) in response to Question No. 23 replied that he was not a person who "has given false testimony for the purpose of obtaining any benefits under the immigration laws."

Regarding Schiffer's N–400 Application, Mr. Cole testified that in response to Question No. 10,[33] the defendant was required to list his arrest as a suspected war criminal. Instead, Schiffer responded in the negative. When Schiffer swore under oath to the truth of this answer, he gave false testimony. Mr. Cole testified that if a naturalization examiner had discovered that an applicant had represented that he was never arrested, when in fact he had been arrested as a suspected war criminal, the examiner would have recommended that the applicant be denied citizen-

ship. *See United States v. Montalbano*, 236 F.2d 757 (3d Cir.) (Naturalized citizen held to have illegally procured citizenship by denying existence of arrest record when in fact he had been arrested; fact that alien would not have been refused citizenship on basis of arrest record is immaterial.), *cert. denied sub nom., Genovese v. United States*, 352 U.S. 952, 77 S.Ct. 327, 1 L.Ed.2d 244 (1956).

The Government claims that Schiffer's pattern of providing false and misleading responses at different stages of the immigration process establishes Schiffer's subjective intent to obtain immigration benefits by false testimony. We agree.

In 1948, Schiffer made his first attempt at returning to the United States. At that time, he went to the United States Consulate in Salzburg, Austria. In a sworn affidavit before Vice Consul Peter Constan, Schiffer represented his wartime service as *Waffen* – SS *Wachmannschaft*. Unable to obtain a passport, Schiffer then went to the DPC in an effort to obtain a visa under the Displaced Person Act. He was rejected because of his *Waffen* –SS Death's Head Battalion service. From these two rejections, we believe that Schiffer learned the consequence of providing answers that disclosed his concentration camp guard service. That is, Schiffer learned that disclosure of his wartime service as a *Waffen* –SS guard precluded him from obtaining admittance to the United States. From this point on, Schiffer carefully avoided disclosing any information that would reveal his service. For example, when asked about his wartime service, Schiffer consistently misrepresented that he was a member of the "German Army."[34] In 1952, Schiffer again

---

**32.** This argument is addressed below in connection with the Government's claim that Schiffer procured citizenship by concealment or misrepresentation of material facts.

**33.** Question No. 10 asks:

Have you ever, in the United States or in any other country, been arrested, charged with violation of any law or ordinance, summoned into court as a defendant, convicted, fined, imprisoned, or placed on probation or parole, or forfeited collateral for any act involving a felony, misdemeanor, or breach of any public law or ordinance?

**34.** As previously discussed, it was commonplace for SS guards to either lie completely about their wartime service or misrepresent it as "German Army" service for the purpose of gaining admittance to this country. *See Fedorenko v. United States*, 449 U.S. 490, 496, 101 S.Ct. 737, 742, 66 L.Ed.2d 686 (1981); *United States v. Schmidt*, 923 F.2d 1253, 1256 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991); *Kulle v. INS*, 825 F.2d 1188, 1195 (7th Cir.1987) (In an interview with Department of Justice personnel, the defendant admitted knowing that, had he told the truth about his SS service, he would have been denied admission to the United States.), *cert. denied*, 484 U.S. 1042, 108 S.Ct.

applied for a passport. In his application, although not specifically asked, Schiffer falsely stated that he had served in the "German Army (SS unit)" from 1943 through 1945 in various locations in Germany. We believe this demonstrates Schiffer's knowledge that members of the combat units of the SS were eligible for admission to the United States, unlike members of the Death's Head Units. Ultimately, Schiffer's passport application was rejected and a Certificate of Loss of Nationality was issued based solely upon his Romanian Army service.

Having been denied the rights and privileges of a United States citizen, on April 9, 1953 Schiffer applied for an immigrant visa. In this visa application, he again stated that he was a member of the German Army, thus misrepresenting and concealing his *Waffen* – SS service.[35] Thus, when confronted in the naturalization application with a question, such as Question No. 10, which required him to reveal information about his wartime service,[36] Schiffer intentionally answered the question falsely. We find that Schiffer's purpose in falsely testifying was to obtain citizenship, and that he purposefully answered Question No. 10 falsely so as to avoid rejection and obtain his goal of citizenship.[37]

773, 98 L.Ed.2d 860 (1988); *United States v. Breyer*, 829 F.Supp. 773, 776 (E.D.Pa.1993); *United States v. Leprich*, 666 F.Supp. 967, 970 (E.D.Mich. 1987); *United States v. Kairys*, 600 F.Supp. 1254, 1266 (N.D.Ill.1984), *aff'd*, 782 F.2d 1374 (7th Cir.), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986); *United States v. Schellong*, 547 F.Supp. 569, 576 (N.D.Ill.1982) ("Given the *widely recognized consequences* to an immigrant who had been linked to the concentration camps, ... defendant had ample reasons to hide his guard service.") (emphasis added), *aff'd*, 717 F.2d 329 (7th Cir. 1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984); *United States v. Demjanjuk*, 518 F.Supp. 1362, 1379 (N.D.Ohio 1981), *aff'd*, 680 F.2d 32 (6th Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982).

**35.** The evidence unequivocally demonstrated that Schiffer knew that the *Waffen* – SS was different from the German Army. Dr. Sydnor testified that the *Waffen* – SS was not part of the *Wehrmacht* or the German Army. Significantly, Schiffer himself acknowledged this to be true. While detained as a POW and as a war crimes suspect, Schiffer completed forms and was interrogated by the U.S. Army/CIC personnel. During this time, Schiffer consistently represented that he

### 2. *Concealment/Misrepresentation*

To revoke a person's citizenship on grounds of concealment or misrepresentation, the Government must plead and prove four independent requirements: (1) the naturalized citizen must have misrepresented or concealed some fact; (2) the misrepresentation or concealment must have been willful; (3) the fact must have been material; and (4) the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment. *Kungys v. United States*, 485 U.S. 759, 767, 108 S.Ct. 1537, 1544–45, 99 L.Ed.2d 839 (1988).

The Government contends that the defendant concealed or misrepresented material facts when he (1) failed to list the *Waffen* – SS *Totenkopfsturmbann* (Death's Head Battalion) in response to Question No. 13 on Form N–400 (P–2, "Application to File Petition for Naturalization" and "Statement of Facts for Preparation of Petition"); (2) failed to disclose his arrest as a suspected war criminal in response to Question No. 10 of his Form N–400 application; and (3) swore on his Petition for Naturalization that he was of good moral character and attached to the principles of the Constitution.

served in the *Waffen* – SS, and never claimed to have served in the German Army. In one telling instance, Schiffer was required to indicate his dates of membership in five listed organizations, including the *Waffen* – SS and the *Wehrmacht* (Armed Forces). Defendant only indicated membership in the *Waffen* – SS. Moreover, Schiffer offers no basis or explanation for his present claim that the *Waffen* – SS was part of the German Army.

**36.** If an applicant's response to Question No. 10 was affirmative, he was required to provide the date, place, offense involved and the outcome. Hence, an affirmative answer to this question would have required disclosure of the details of his arrest as war crimes suspect which, in turn, would have resulted in the disclosure of his *Waffen* – SS service.

**37.** We also agree with the Government that Schiffer gave false testimony when, in response to Question No. 23, he specifically swore that he was not a person who "has given false testimony for the purpose of obtaining any benefits under the immigration and naturalization laws." As discussed, Schiffer had in fact given false testimony when he lied under oath in response to Question No. 10.

█ In response, Schiffer argues that (1) Question 13 was broad and ambiguous and did not require disclosure of "*Waffen*–SS" service; (2) the failure to disclose his arrest is outside the scope of the Government's Complaint and, therefore, not at issue;[38] and (3) the Government must prove that his response to Question No. 13 willfully concealed or misrepresented material fact in order to establish his alleged lack of good character.[39]

### a. *Question No. 13.*

Question No. 13 of Form N–400 asks:

What organizations, clubs, or societies in the United States or in any other country have you been a member of before the last 10 years? (If none, write "none.")

In the box provided for a response appears the word "NONE" apparently in the applicant's own handwriting. During his interview with naturalization examiner, the response "NONE" was crossed out and the words "German Army 1943–1945" were written in. The Government argues that these responses were purposeful misrepresentations designed to conceal the true nature of Schiffer's wartime activities.[40]

After carefully reviewing the testimony of the Government's expert witness, the relevant case law and Form N–400, we agree with Schiffer that his foregoing responses do not constitute a willful misrepresentation or concealment. As stated elsewhere in this opinion, in denaturalization cases the facts

and law should be construed as far as is reasonably possible in favor of the citizen. *Schneiderman v. United States,* 320 U.S. 118, 122, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796 (1943). We note that Question 12 was similar to Question 13, but was limited to the prior ten years and did not include anything prior to 1948. While Question 13 did include the war, we agree with Judge Bechtle that Question No. 13 does not specifically ask for the information the Government claims Schiffer concealed or misrepresented. *See United States v. Osidach,* 513 F.Supp. 51, 104–105 (E.D.Pa.1981). As acknowledged by other courts, Question No. 13 is ambiguous. For example, in reviewing a similar but even broader question, Justice Stevens remarked that

it is arguable that the Treblinka guard service was neither the sort of "membership" in a club or organization nor the sort of "military service" that the question contemplated.

*Fedorenko v. United States,* 449 U.S. 490, 532 n. 3, 101 S.Ct. 737, 760 n. 3, 66 L.Ed.2d 686 (1981) (Stevens, J., dissenting);[41] *accord United States v. Kairys,* 600 F.Supp. 1254, 1267 (N.D.Ill.1984), *aff'd,* 782 F.2d 1374 (7th Cir.), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986); *United States v. Osidach,* 513 F.Supp. 51, 104–05 (E.D.Pa. 1981) (The court found that an almost identical question was much too ambiguous to cover the defendant's Ukrainian police service). The Government acknowledges as much[42]

---

**38.** This argument completely ignores the fact that we granted the Government's motion to amend the complaint to specifically include this issue. (March 16, 1993 Tr., pp. 3–6).

**39.** Schiffer clearly miscomprehends the Government's argument. The Government is not relying on Schiffer's response to Question No. 13, but rather relies on Schiffer's lack of good moral character demonstrated by his camp guard service and his sworn answer to Question No. 23. Furthermore, the Supreme Court has interpreted § 1101(f)(6) as denominating "a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits." *Kungys v. United States,* 485 U.S. 759, 780, 108 S.Ct. 1537, 1551, 99 L.Ed.2d 839 (1988).

**40.** We note that at least one other court has found that the *Waffen*–SS was never a part of

the German army. *See United States v. Schellong,* 717 F.2d 329, 331 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).

**41.** The majority likewise acknowledged that "none of the questions in the application for citizenship explicitly required petitioner to disclose [his wartime service as a concentration camp armed guard]." *Fedorenko,* 449 U.S. at 497 n. 9, 101 S.Ct. at 742 n. 9.

**42.** In a footnote, the Government states "service in the Armed Forces of a country may not have been required to be listed." Plaintiff's Reply Brief, p. 56 n. 18. Nonetheless, the Government argues, without support, that "membership in a political organization, such as the *Waffen*–SS, that also happened to be an armed organization, was required to have been listed." *Id.* We do not find this hollow characterization to cure the question's inherent ambiguity.

and we agree. Furthermore, the current version of this form specifically asks about service in military and paramilitary units during the war and in labor camps.

As Judge Bechtle of this court sagely noted:

> [i]f a person was neither asked by interview nor by written application of his wartime activities, there would be no duty ... to disclose that information. Although that fact would be material, there can be no duty to disclose where it was not asked.... It would be fundamentally unfair to place upon a person the duty to disclose information not asked for. Otherwise, the reach of the duty would be as far and as varied as the undisclosed imagination of the interviewer concerning his belief in his mission.

*United States v. Osidach*, 513 F.Supp. 51, 68–69 (E.D.Pa.1981). The Government asserts that "the examiner obviously questioned defendant as to his wartime service." Plaintiff's Brief, p. 57. This *may* be so but this argument is without any true factual support and fails woefully in light of the Government's heavy burden in this case. *See United States v. Sokolov*, 814 F.2d 864, 871 (2d Cir.1987) (Government failed to carry its burden where there was no evidence as to the citizen's actual interview or evidence that examiners were required to and always did ask particular questions.), *cert. denied*, 486 U.S. 1005, 108 S.Ct. 1728, 100 L.Ed.2d 193 (1988); *Osidach*, 513 F.Supp. at 105 ("[T]here is no clear evidence on the present record that Osidach was personally asked that question [about World War II service] by [the examiner] during his 1963 interview, or even that the question was routinely asked of all applicants as a matter of INS official policy which might have been shown through documentary or testimonial proof."). There must be more than inference or surmise before we will revoke the rights and privileges of citizenship.

We do not believe that *United States v. Schellong*, 717 F.2d 329 (7th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984) compels the opposite conclusion. In *Schellong*, the defendant, in re-

sponse to a similar question, listed some service but omitted other service and specifically disclaimed service in a concentration camp. This response clearly demonstrated his understanding that this inquiry required him to include military and paramilitary service. On the record before us, we do not find clear evidence of a similar understanding on Schiffer's part.

### b. *Question No. 10.*

Schiffer's failure to disclose his arrest in response to Question No. 10 raises two issues.[43] First, did Schiffer know that he was arrested. Second, was Schiffer's arrest material.

There is no dispute that Schiffer was arrested. In addition, Professor Ziemke testified that the defendant would have been made aware of the fact that he was under arrest as a war crimes suspect. Indeed, Schiffer admitted that he was in fact arrested pursuant to the automatic arrest category, which authorized the arrest of all persons who were members of the Death's Head Units. While acknowledging this fact, Schiffer claimed that this arrest somehow did not count. Without inquiring into the source of Schiffer's belief, we find that he knew that he had been arrested and willfully concealed this fact because, as discussed below, it would have led to the disclosure of his *Waffen*–SS *Totenkopfsturmbann* service—a fact which defendant knew would jeopardize his application for citizenship. Therefore, we find Schiffer's failure to disclose his arrest as a war crimes suspect in response to Question No. 10 was a willful misrepresentation.

In *Kungys v. United States*, the Supreme Court announced the test for materiality under § 1451(a) as whether the misrepresentation or concealment had a natural tendency to produce the conclusion that the applicant was qualified. *Kungys v. United States*, 485 U.S. 759, 771–72, 108 S.Ct. 1537, 1547, 99 L.Ed.2d 839 (1988). Under this standard, the question presented is whether Schiffer's concealment of his arrest as a war crimes suspect would have influenced the INS's or the District Court's decisions in

---

43. Unlike Question No. 13, this question is not limited timewise and is free from ambiguity.

**1204**

allowing defendant to enter the country and in granting him naturalization. We answer this question in the affirmative.

In "determining the natural tendency of a misrepresentation to affect a decision under § 1451(a), what is relevant is what would have ensued from official knowledge of the misrepresented fact ..." *Id.* at 775, 108 S.Ct. at 1549. Mr. Cole testified, based on the standards and practice in effect in the Philadelphia office of the INS at the time Schiffer applied for naturalization, that if an applicant had disclosed his arrest as a suspected war criminal, an investigation would have been ordered.[44] An investigation into Schiffer's arrest would obviously have disclosed his *Waffen* –SS service as a concentration camp guard.[45] *See Kungys*, 485 U.S. at 774, 108 S.Ct. at 1548 ("[T]he misrepresentation of [the defendant's date and place of birth] would have a natural tendency to influence the citizenship determination, and thus be a misrepresentation of material facts, if the true date and place of birth would predictably have disclosed other facts relevant to his qualifications."). As Mr. Cole further testified, if an applicant disclosed his wartime service as a concentration camp guard, his petition for naturalization would have been denied on the grounds that the applicant lacked good moral character. It is clear in light of this testimony that if Schiffer's arrest as a war crimes suspect had been known by the examiner, Schiffer would have been denied citizenship.[46]

As the Supreme Court stated in *Chaunt v. United States*, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960):

[f]ull and truthful response to all relevant questions required by the naturalization procedure is, of course, to be exacted, and temporizing with the truth must be vigorously discouraged. Failure to give frank, honest, and unequivocal answers to the court when one seeks naturalization is a serious matter. Complete replies are essential so that the qualifications of the applicant or his lack of them may be ascertained.

*Id.* at 352, 81 S.Ct. at 149. By failing to answer Question No. 10 truthfully, Schiffer precluded the examiner from ascertaining his moral character. Schiffer's false answer clearly thwarted an avenue of inquiry that would have led to disqualifying information and, therefore, we find that he procured citizenship as a result of his concealment of a material fact.

**3. *Misrepresentation of Good Moral Character***

 In his Petition for Naturalization, Schiffer swore that he was and had been "during all the periods required by law, a person of good moral character." The Government contends that in doing so, he willfully made a material misrepresentation, constituting another ground for revoking Schiffer's citizenship. The Government argues that because Schiffer was a concentration camp guard and because he willfully lied to gain entry and citizenship, he lacked good moral character. This is certainly true. What the Government failed to prove, however, was that Schiffer's false claim of good moral char-

44. In 1958, when defendant applied for naturalization, the Philadelphia office of the INS had an investigative section. If a naturalization examiner believed an investigation was warranted, it was the practice of the naturalization examiner to request the investigative section to initiate an investigation. The investigative section was empowered to request information from other governmental agencies. (P–155, pp. 176–77).

45. Schiffer also asserts that concealment of his arrest and *Waffen* –SS service was not material because the DPC and CIC already had possession of this information. The naturalization examiner and other INS personnel who handled defendant's Application and Petition for Naturalization were not aware of, nor in possession of, this information. Knowledge by other federal agen-

cies or authorities, such as the Army, of an applicant's criminal record cannot be imputed to the INS. *See United States v. Accardo*, 113 F.Supp. 783, 785 (D.N.J.), *aff'd*, 208 F.2d 632 (3d Cir.1953), *cert. denied*, 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098 (1954).

46. Indeed, the grave nature of the crime alleged would be sufficient to raise serious questions in an examiner's mind as to Schiffer's good moral character. *See Chaunt v. United States*, 364 U.S. 350, 354, 81 S.Ct. 147, 150, 5 L.Ed.2d 120 (1960) (Court looked at the totality of the circumstances surrounding the offenses charged, including whether they involved moral turpitude or conduct which even peripherally touched types of activity which might disqualify one from citizenship.).

acter was willfully made. The statement to which Schiffer attested does not define "good moral character." Moreover, the relevant time period, "during all the periods required by law," is ambiguous. Accordingly, the Government has not convincingly demonstrated that Schiffer actually understood the meaning of the phrase "good moral character" or that the question may refer to·events preceding his naturalization hearing by more than five years. Absent some proof as to Schiffer's understanding of this question, we do not believe that the Government has carried its burden of proof. *See United States v. Profaci*, 274 F.2d 289, 292 (2d Cir.1960) ("But, when a question is not reasonably free from ambiguity, a clear understanding thereof and an intent to deceive are not to be readily implied merely from a false answer."). The Government points to Schiffer's repeated misrepresentations and concealments in his effort to gain United States citizenship as evidence of his willfulness. It appears that the Government argues either (1) that his claim of good moral character is just one in a series of willful misrepresentations or (2) his series of misrepresentations instilled Schiffer with the knowledge that he lacked good moral character. In light of the Government's heavy burden, we believe that both arguments fail. Neither argument demonstrates clearly and unequivocally that Schiffer understood that he lacked good moral character. At best, the Government's arguments establish that Schiffer should have known that good moral character was lacking.

## IV. *ULTIMATE FINDINGS OF FACT AND CONCLUSIONS OF LAW*

### A. *EXPATRIATION*

1. Nikolaus Schiffer was born in the United States and, as a result, acquired United States citizenship.

2. Nikolaus Schiffer knew at least from the time that he was a teenager that he was a United States citizen. He also knew that as a United States citizen he was exempt from Romanian service.

3. Nikolaus Schiffer voluntarily joined the Romanian army and he did so with the spe-

cific intent to relinquish the United States citizenship he acquired at birth.

4. Nikolaus Schiffer voluntarily relinquished his United States citizenship pursuant to 8 U.S.C. § 1481(a)(3).[47]

### B. *DENATURALIZATION*

1. Nikolaus Schiffer procured his naturalized United States citizenship illegally. 8 U.S.C. § 1451(a).

(a) Nikolaus Schiffer lacked the good moral character required for citizenship as a result of his voluntary service in the *Waffen*-SS Death's Head Battalion, participation in two death marches and armed guarding of prisoners forced to perform slave labor under dangerous and subhuman conditions. 8 U.S.C. § 1427(a)(3).

(b) Nikolaus Schiffer lacked the good moral character required for citizenship as a result of the false testimony he gave in response to Question Nos. 10 and 23 on Form N–400 with the subjective intent of obtaining immigration benefits. 8 U.S.C. § 1427(a)(3); § 1101(f)(6).

2. Nikolaus Schiffer procured his naturalized citizenship by willful concealment and misrepresentation of a material fact. 8 U.S.C. § 1451(a).

(a) Nikolaus Schiffer willfully misrepresented and concealed his arrest as a war crimes suspect.

(b) Disclosure of Schiffer's arrest as a war crimes suspect would have resulted in denial of citizenship since it would have revealed his *Waffen*–SS Death's Head Battalion service, his false testimony and his lack of good moral character.

3. Nikolaus Schiffer's citizenship must be revoked. 8 U.S.C. § 1451(a).

## V. *CONCLUSION*

It is not without compassion that we decide these issues as we have. On many occasions, we have had the privilege and pleasure of conducting naturalization ceremonies. The task we performed on those occasions was infinitely more pleasurable than the one we undertake today. We are mindful of the harsh consequences of our decision. We are

---

**47.** We believe that Schiffer's voluntary service in the *Waffen*–SS alone also would have been suffi-

cient to relinquish the United States citizenship he acquired at birth.

**1206**

equally aware, however, of the precious gift of United States citizenship and the strict requirements and responsibilities that accompany it. It is with these considerations in mind that, having carefully reviewed the record of this case, we conclude, for all the foregoing reasons, that the defendant has voluntarily expatriated himself and procured his naturalized citizenship illegally and by concealing and misrepresenting material facts.

An appropriate order follows.

### ORDER

AND NOW, this 25th day of August, 1993, upon consideration of the Government's Proposed Findings of Fact and Post-trial Brief filed on May 7, 1993, Defendant's Response thereto filed on May 18, 1993, and the Government's Reply to the Defendant's Response filed on June 1, 1993, the record and the applicable law, it is hereby **ORDERED** that this court's order of August 13, 1958, admitting defendant to citizenship, is hereby set aside, and it is further ordered that defendant's Certificate of Naturalization No. 7993986 is hereby canceled, and that certificate be surrendered to the United States Attorney for the Eastern District of Pennsylvania within sixty (60) days of the date of this order.